Russell McPHAIL, Plaintiff, Appellant,

v.

The L. S. STARRETT COMPANY, Defendant, Appellee.

No. 5330.

United States Court of Appeals First Circuit.

Heard May 7, 1958.

Decided July 18, 1958.

Walter Powers, Boston, Mass., with whom Walter Powers, Jr., Boston, Mass., was on brief, for appellant.

Charles B. Rugg, Boston, Mass., with whom Fred B. Lund, Jr., Henry S. Streeter and Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a judgment entered for the defendant in a suit brought by a minority stockholder to enjoin his corporation from putting an employees' stock option plan into operation. The plaintiff is a citizen of Florida, the defendant is a Massachusetts corporation, and there can be no doubt whatever that the matter in controversy between them exceeds the sum or value of $3,000 exclusive of interest and costs. Thus federal jurisdiction under Title 28 U.S.C. § 1332 (a) (1) is clearly established.

The L. S. Starrett Company, the defendant-appellee herein, is an old, well-established corporation which employs some 1400 persons in Athol, Massachusetts, in the business of manufacturing band saws, hack saws and precision machinists' tools. At all times material hereto it had only one class of stock, common without par value. Two hundred thousand shares of this stock were authorized of which 150,000 shares were issued and outstanding.[1] Of these the plaintiff, McPhail, owned 20,400 shares

1. On August 3, 1929, when the stockholders at a meeting held in Athol voted to increase the authorized shares of common stock from 2,500 to the present 200,000 shares, it was unanimously voted: "That the board of directors of this corporation be and it hereby is authorized, without offering the same, or any part thereof. to the stockholders for subscription, to issue the whole or any part.

during the pertinent period, which made him the largest stockholder. The officers and directors collectively owned less than 4,000 shares, or approximately 3 per cent of the outstanding stock, and the balance was in the hands of some 2,000 stockholders. The stock is listed and traded on both the New York and Boston Stock Exchanges.

On September 17, 1952, the directors of The L. S. Starrett Company (for simplicity the Company hereinafter), ostensibly to increase employee incentive, voted to authorize the officers of the Company "to develop and install an Employee Stock Purchase Plan" available to all employees who wished to participate "under which payroll deductions may be made for employees authorizing the same, and the amounts deducted used for outright purchases of shares of stock of the Company." Pursuant to this vote the officers of the Company submitted to the Directors, and the Directors approved, a plan with which we are not here concerned under which employees acquired nearly 5,000 shares of the Company stock. Subsequently the corporate officers after further study and consultation with Company counsel submitted another plan, which is the one under consideration herein, designed to supplement if not to supersede the earlier one, and the Directors approved this second plan on November 30, 1955, subject to the approval of the stockholders.

Under this latter plan not more than 20,000 of the authorized but unissued shares of the Company stock were to be allocated for purchase by employees on the installment plan. All employees with six months service or more with the Company were eligible to participate, but the maximum number of shares which any employee might purchase could not exceed in market value at the time of

granting the option the amount of the employee's base annual compensation, or 500 shares, whichever should be less.[2] The plan was to be administered by a Committee consisting of not less than two members of the Board of Directors, none of whom were employees and hence were ineligible to participate in the plan, and this Committee would have powers to determine the employees who were to be granted options and the number of shares subject to each option. In making its determination the Committee was directed "to take into consideration the employee's present or potential contribution to the continued success and growth of the Company and any other factors which the Committee may deem relevant."

Eligible employees selected by the Committee for participation in the plan were to be granted options to purchase the shares allocated to them. These options were nontransferable and could be exercised only by the optionee and then not later than thirty days after granting and only if he were still employed by the Company.

■ An eligible employee who elected to participate in the plan was required to sign a Purchase Agreement, so-called, within the thirty-day period allowed for acceptance of the option, wherein he agreed to purchase all or any part of the stock allotted to him at its "fair market value * * * at the time of the grant of the option as found by the Committee." Upon receipt of an executed Purchase Agreement and payment of the first installment due thereunder, the Company undertook to issue the appropriate number of shares in the name of the employee, but simultaneously with the issuance of the shares the employee agreed to pledge them with the Company as security for the purchase price.

---

of the authorized capital stock of this corporation at such time or times, to such person or persons, whether or not stockholders of this corporation, and for such consideration, or as stock dividends, as shall be determined from time to time by the board of directors."

This vote has not since been altered, amended, or rescinded.

2. Only the president of the Company, Mr. A. H. Starrett, who owned 1353 shares, qualified under the plan for the full allotment of 500 shares.

Payment for the stock could be made in installments over a period of up to ten years either by authorized payroll deductions, or by crediting dividends paid on the shares issued, or by cash payments, but by the end of five years at least 50% of the purchase price had to come from a source other than dividends, i. e. payroll deductions or cash payments. No interest was to be charged by the Company on unpaid balances of the purchase price not in arrears but might be charged on overdue payments. When an employee signed a Purchase Agreement, and made his first payment thereunder, he became the owner of the shares purchased and as such entitled to dividend and voting rights. Upon termination of employment an employee's right to pay for his stock in installments without interest terminated.

On January 6, 1956, the clerk of the Company by order of the Board of Directors sent out notices to all stockholders of a special meeting to be held at the office of the Company in Athol on January 25, 1956, to vote on the plan. Included with the notice of meeting was a general statement describing the plan,[3] a copy of the plan itself, and proxies solicited by the management for a favorable vote on the plan, all of which material had been approved by the Securities and Exchange Commission.

On January 13, 1956, before the date set for the meeting, the plaintiff McPhail, who had begun to acquire stock in the Company in 1950, and who had made himself known to the Company officers as a holder of 10% or more of the Company stock in August, 1953, when he unsuccessfully sought election to the Board of Directors, visited the Company's office in Athol and expressed to the Company's management his strong opposition to the plan. The stockholders' meeting was postponed at McPhail's request to give him time to mail material in opposition to the plan to the stockholders, which he did on February 24, and on March 8 the stockholders met and voted to approve the plan. At the meeting 142,738 shares were outstanding and entitled to vote, 128,055 shares were represented in person or by proxy and of these 87,297 shares were voted for the plan; 38,758 shares were voted against it.[4]

The prospectus with regard to the plan became effective by order of the S.E.C. on April 2, 1956, and the plan was approved by the Massachusetts Department of Public Utilities on May 25, 1956. On March 6, 1957, the Directors limited the number of shares to be issued under the plan during that year to 11,500, and we understand that the plan to that extent at least has already gone into effect.

The plaintiff-appellant makes a two-pronged attack upon the plan. One prong consists of the contention that the plan is illegal in two respects; the other consists of the contention that the plan was adopted for an illegal purpose.

The plan is said to be illegal in that it contemplates issuing stock to some employees without any down payment, or a very small one, and thereafter permitting a substantial part of the purchase price to be paid by the crediting of dividends declared on the stock not paid for, and in that it contemplates the granting, without consideration, of valuable options to buy stock on more favorable terms than could be obtained by the plaintiff, who is not an employee of the Company. We find no merit in either contention.

The appellant concedes in his brief that he is not aware of any decisions of

3. In this statement it was said that the Company contemplated, subject to market conditions, purchasing shares of its stock from time to time on the open market in amounts approximating the number of shares to be issued under the plan, and that it already had 7,262 shares in its treasury and expected to acquire more to the extent required. At the time of the hearing in the court below the Company held 14,251 shares in its treasury which it had acquired in anticipation of approval of the plan.

4. Eleven stockholders, apparently holding 2,000 shares, were represented at the meeting but did not vote.

any appellate court squarely in point on the issues he raises. And he also concedes, as he must, that Mass.G.L.(Ter. Ed.) c. 156, § 15, under the subtitle "For What Stock May Be Issued" provides in material part that "Stock issued for cash may be paid for in full before it is issued or by instalments," and that by amendment in 1951, § 8 of Chapter 154 id. allows the deduction of "payments * * * toward * * * purchase of stock pursuant to an employee stock purchase plan, from wages of an employee by an employer in accordance with a written request made by the individual employee. * * *" Furthermore, § 14 of the above chapter 156, provides that subject to provisions in the corporate Agreement of Association creating different classes of stock with different preferences as to dividends and voting rights "* * * every share without par value shall be equal to every other such share." From these provisions it is clear that under the Massachusetts statutes the Company not only might sell its stock to its employees on the installment plan, and receive payment therefor by authorized payroll deductions, but also that having done so, since it had only common stock without par value, it was authorized if not required upon issuing stock to an installment purchaser to accord that purchaser equal voting and dividend rights with its other stockholders.[5] Since the Massachusetts statutes allow the Company to pay dividends on the stock sold to employees under the plan, we see no basis whatever for the contention that so far as the statutes themselves are concerned the Company could not as security for payment credit such dividends against the purchase price if the employee so desired.

But the appellant contends that the statutory provisions ought not always to be read literally, and that so far as this particular case is concerned, "the law should be that, unless all stockholders agree, dividends should be paid only on stock for which the stipulated payment has been received by the corporation." In short, he is asking us by judicial decision to engraft on the Massachusetts statutes an even more restrictive provision than that in force in the states referred to in footnote 5 above, for he is asking us to rule, at least for the purposes of this case, that dividends not only may, but must, be paid only in proportion to the amount of the consideration actually paid in for stock bought on the installment plan. We think that this would be asking a good deal of the Supreme Judicial Court of the Commonwealth of Massachusetts. Certainly it is asking far more of us who are charged under Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, not with making the law of Massachusetts but with determining, following and applying it. We decline the invitation extended to us by the appellant to write a missing provision into the Massachusetts statutes.

This is not to suggest that there may not be cases of this general nature in which a court of equity would be justified in giving relief to minority stockholders in spite of literal compliance with the statutory provisions, as, for instance, cases in which only one or a very few corporate employees in the higher echelons of command who by large stock holdings have actual or practical control over their corporation are given an opportunity extending over a great many years to subscribe for stock at a very advantageous price. There will be time enough to consider such situations when they arise. It will suffice at this point to say only that the case at bar does not fall into this category.

We turn now to the appellant's contention that the plan is illegal because it contemplates the granting without consideration of valuable options to buy stock on more favorable terms than the

---

5. Apparently the statutes in force in some states provide that dividends on partly paid up shares *may* be paid in proportion to the amount of the consideration actually received therefor, but Massachusetts has no such statute. See Dodd & Baker; Cases and Materials on Corporations (2nd Ed. 1951), at page 1176.

plaintiff could obtain. In discussing this contention the appellant says in his brief that he is attacking the granting of the proposed options as distinguished from the so-called Purchase Agreements. He concedes that the Company would "be receiving something, a qualified promise, for the purchase and sale agreements, which would not be gratuitous." But he says: "The grant of the options under the proposed Plan would be wholly without consideration."

■ So limited, the appellant's contention is easily disposed of, for it is elementary law that an option is not always a contract but an offer to enter into a contract coupled with a promise to hold the offer open for a given period of time, which promise is or is not binding on the offeror depending on whether or not it is supported by consideration. 1 Williston on Contracts (Rev.Ed.1936) § 25. Lack of consideration for an option therefore does not destroy an option or render it illegal as an offer. The only effect on an option of lack of consideration is to make the promise to keep the offer open unenforceable against the optionor. Thus an option without consideration is only an offer which like any other offer may be revoked by the offeror at will at any time before the offer is accepted, i. e. the option taken up, and the offer ripened by acceptance into a contract. Boston & Maine R. v. Bartlett, 1849, 3 Cush. 224, 57 Mass. 224. Therefore, even if the instant options were determined to be unsupported by legal consideration, they would nevertheless remain offers, which if the Company kept its word, as we may well suppose that it would in the interest of its relations with its employees, could be accepted by the execution of a Purchase Agreement by the optionee at any time within 30 days after the granting of the option and thereupon the options would be matured into contracts.

■ The thrust of the appellant's argument on this point, however, is somewhat deeper than the foregoing discussion indicates. He says that the options to buy stock given to the employees were things of cash value to the Company because of the advantageous terms under which the stock could be paid for, so that, to grant the options to employees without receiving any consideration in return therefor, amounted to a gift of corporate assets to the employees in violation of the rule in Rogers v. Hill, 1933, 289 U.S. 582, 591, 592, 53 S.Ct. 731, 735, 77 L.Ed. 1385, wherein, quoting with approval from Judge Swan's dissenting opinion in the court below, the Court said: "If a bonus payment has no relation to the value of services for which it is given, it is in reality a gift in part, and the majority stockholders have no power to give away corporate property against the protest of the minority."

We do not, of course, question the soundness of the above rule. Nor do we feel it necessary to comment on the apparent applications of that rule in the Delaware cases cited in the margin on which the appellant relies.[6] The reason for this is that the courts in those cases were dealing with factual situations quite different from the situation here. That is to say, in the Rosenthal case the corporation was in fact the captive of the sole beneficiary of the stock option plan involved, since he was the president and largest stockholder of the corporation, and furthermore the option plan allowed him to buy a large block of stock at less than market price and gave him many years in which to decide whether or not to exercise his option. And in the Kerbs and Donovan cases there was nothing in the plans involved to give any assurance to the corporations that the beneficiaries would remain in their employment, and hence no assurance to the corporations that they would receive the stimulated efforts of their employees

6. Rosenthal v. Burry Biscuit Corp., 1948, 30 Del.Ch. 299, 60 A.2d 106; Kerbs v. California Eastern Airways, 33 Del.Ch. 69, 90 A.2d 652, 34 A.L.R.2d 839, petition for reargument denied 1952, 33 Del.Ch. 174, 175, 91 A.2d 62, 34 A.L.R.2d 839; Frankel v. Donovan, Del.Ch.1956, 120 A.2d 311.

which they hoped and desired to obtain from the granting of the options. In the case at bar, however, the situation is quite different. The Company is not the captive of any one beneficiary of its Employee Stock Purchase Plan, or even of all of them combined, for its stock is widely held and only a small proportion of it is available for purchase under the plan. Nor are the optionees given the right to subscribe for stock at less than its market price but must pay full value for it, and clearly there is a definite incentive for the beneficiaries of the plan to remain at work for the Company, for should they leave they would lose their right to pay for their stock in installments over a ten year period without interest, which to them is the valuable feature of the plan.

Assuming that the provisions of the plan omitting interest charges on installments not yet due and giving ten years to pay for the stock made the options things of value to the Company in the sense that they might be sold by the Company for a price, although the appellant concedes that the value of the options would be difficult if not impossible to determine, the fact remains that the Company could reasonably expect to receive as consideration for the options not only the increased loyalty and effort of its employees but also that its employees who were given options would stay on in their employment to take advantage of the privilege of paying for their stock in installments without interest. Whether this is adequate consideration is a matter of business judgment which has been decided not only by the Company's Board of Directors but also by a substantial majority of its stockholders. Only in a far clearer and stronger case than this would any court be justified in substituting its business judgment for that of those charged with the responsibility of corporate management.

There remains for consideration the appellant's contention that the plan is illegal because it would constitute an unlawful manipulation of voting power for the benefit of management and the majority stockholders and to the detriment of McPhail as the largest minority stockholder.

The basic applicable rule which the appellant seeks to invoke in this phase of his appeal is set forth in Andersen v. Albert & J. M. Anderson Mfg. Co., 1950, 325 Mass. 343, 346–347, 90 N.E.2d 541, 544, to be:

"Directors cannot take advantage of their official position to manipulate the issue and purchase of shares of the stock of the corporation in order to secure for themselves the control of the corporation and then to place the ownership of the stock in such a position as will perpetuate that control. Such action constitutes a breach of their fiduciary obligations to the corporation and a wilful disregard of the rights of the other stockholders."

Strictly speaking, this rule has no application here for the Directors did not adopt the plan; that was done by a majority vote of the stockholders, who apparently were disinterested and who had been fully and honestly informed by the Company's management as to the nature of the plan and knew in detail of McPhail's objections to it. But even if we assume that the Directors of the Company had an improper purpose in mind when they promulgated the plan and that their improper purpose would vitiate the approval of a majority of the stockholders upon challenge by a minority stockholder, the appellant's contention still founders on the finding of the court below, which is amply supported by the evidence, that [157 F.Supp. 563]:

"While the avowed purpose of the Plan was to increase employee incentive, the result unquestionably is to neutralize, at least partially, McPhail's holdings. I am not prepared, however, to find that the Plan was designed solely, or even principally, to achieve this result."

Naturally any increase in the outstanding stock of the Company would dilute McPhail's voting power. But the risk of

such an eventuality was assumed by Mc-Phail when he bought into the Company for the reason that he is chargeable with knowledge of the 50,000 authorized but unissued shares which the Directors had broad powers to issue whenever they saw fit under the stockholders' vote of August 3, 1929, quoted in footnote 1 above. Moreover, the plan contemplated the use of shares purchased on the market and to the extent such shares were used instead of authorized but unissued shares, McPhail's relative voting position as a shareholder would not be affected, unless we make the assumption, which there is no evidence in the record to support, that the optionees would vote their stock as the Company's management directed on pain of discharge.

Perhaps no more needs to be said on this point. But if the motive of the Directors in choosing 20,000 shares for sale under the plan was indeed to neutralize McPhail's holding of 20,400 shares, and their motive is of any importance, the evidence shows a reason for their action other than petty personal dislike of McPhail or a selfish desire to entrench themselves in their managerial positions beyond reach of McPhail. This evidence consists of the findings of a special master appointed by the Superior Court of the Commonwealth of Massachusetts in an unsuccessful suit brought by McPhail in 1953 to obtain access to the Company's list of stockholders. In denying McPhail the relief he requested on the ground that McPhail sought access to the stock and transfer books of the Company for reasons other than his interest as a stockholder, the master found, and his findings were affirmed, that McPhail's purpose was to insinuate himself into the Company's management so that he could manipulate its affairs to his personal profit. The master found that McPhail wished to be elected a director in order to be in a position to reduce the Company's dividend rate, not because of insufficient earnings, but to cause dissatisfied stockholders to sell their stock and so to depress its market value so he could buy it up more cheaply,

but that he ran into opposition from the Company's management for the reason that "Starrett believed in production of tools, not in market manipulations." In addition the master found:

"McPhail's real, ultimate purposes and ends become apparent when a comparison is made of his actions in Transue-Williams Company and The L. S. Starrett Company. Each was selected by McPhail both because the stock of each was listed, making possible a ready market for purchases and sales, and because such stocks would be accepted as collateral at a bank or banks, making possible a source of cash when needed for subsequent purchases of stock. Both of these companies were sufficiently small so that, if necessary to accomplish his purposes, McPhail could buy a majority interest and place himself in control. In each of these companies the stockholdings of the directors is small in comparison with the outstanding stock. McPhail made extensive stock purchases in both companies but accomplished his purpose earlier in the Transue-Williams Company. There he was elected a director and 'had created two extra jobs for himself, the chairman of a finance committee and vice chairman of the Board of Directors.' He had caused the directors to cut the dividend rate of Transue-Williams Company. Similar proposals were made to the officers of the Starrett Company. He requested a position on the Board of Directors. McPhail wanted similar positions,— vice chairman of the Board and chairman of the finance committee to be created in the corporation, and wanted a salary of $60,000 to $65,-000 for part time services in these positions, but would not accept less than $50,000 at least."

We feel that it would be to "strain at a gnat, and swallow a camel," 23 Matt. 24, for us to infer some improper, ulterior or selfish purpose on the part of the directors in choosing a figure to neu-

tralize McPhail's holdings in the face of positive evidence of the legitimate, indeed the laudable purpose of frustrating a raid by him on the investment of other stockholders.

Judgment will be entered affirming the judgment of the District Court.