Charles G. RODMAN, Trustee of the Estate of W. T. Grant Company, Bankrupt, Plaintiff,

v.

The GRANT FOUNDATION, The Connecticut Bank and Trust Company, Individually and as Trustee of Trusts established in December 1942 and May 1956 for the benefit of Helen Grant Biddle Allchin, Edward Staley, Richard W. Mayer, John G. Byler, Raymond H. Fogler, John G. Curtin, Harry E. Pierson, A. Richard Butler, John J. LaPlante, Joseph A. Livolsi, Louis C. Lustenberger, James G. Kendrick, Joseph W. Chinn, Jr., John D. Gray, Joseph Hinsey, DeWitt Peterkin, Jr., Charles F. Phillips, and Asa T. Spaulding, Defendants.

No. 78 CIV. 1653(MP).

United States District Court, S. D. New York.

Nov. 13, 1978.

Lord, Day & Lord, New York City, for defendant The Connecticut Bank and Trust Co., by Genevieve L. Fraiman, New York City, of counsel.

Netter, Dowd & Alfieri, New York City, for defendant LaPlante, by Edward M. Berman, New York City, of counsel.

## OPINION

POLLACK, District Judge.

The defendants seek dismissal of this suit on the grounds that the plaintiff has failed to state or show grounds entitling him to relief and that the Court lacks subject matter jurisdiction. Rules 56(b), 12(b)(1) and 12(b)(6), Fed.R.Civ.P. The plaintiff has proceeded in this Court on the notion that he is asserting violations of the Securities Exchange Act of 1934, specifically sections 10(b) and 14(a) thereof, 15 U.S.C. §§ 78j(b), 78n(a), and Rules 10b–5 and 14a–9 thereunder, 17 C.F.R. §§ 240.10b–5, 14a–9.

This suit arises from seven purchases by the W. T. Grant Company ("Grant") of its own stock, common and preferred, made between May 1969 and September 1972. The plaintiff seeks to have either rescission from the sellers of the stock or damages from the sellers and the directors of Grant. A prior suit is pending in New York State Supreme Court which seeks the same relief for the same stock purchases against the same defendants. Other matters are complained of as well in the state court suit.

For the reasons shown hereafter, the defendants are entitled to judgment of dismissal of this suit.

Weil, Gotshal & Manges, New York City, for plaintiff, by Mel P. Barkan, and Steven J. Shore, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendant William T. Grant Foundation, Inc., by Thomas C. Morrison, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for individual defendants, by James W. Lamberton, and Thomas J. Moloney, New York City, of counsel.

I.

W. T. Grant Company was a mercantile chain founded by William T. Grant in 1906. It flourished and grew to have assets at the end of 1968 of approximately $400 million. Its annual sales were of almost $1 billion; it operated 1100 stores; it had 17,500 stockholders and approximately 13.8 million shares of common stock issued and outstanding. A "control group" (so styled by

the plaintiff)[1] collectively controlled 43.3% of Grant's shares and voted those shares identically when one or more members of the group did not abstain. This group at the end of 1968 consisted of the defendants William T. Grant Foundation ("Foundation"), a charitable foundation organized by the founder of Grant, the Connecticut Bank and Trust Company ("CBT"), trustee or co-trustee of numerous trusts established by Mr. Grant, and the individual defendants Staley, chairman of Grant and a trustee of the Foundation, Mayer, president and chief executive officer of Grant, Fogler, a director of Grant and a trustee of the Foundation, and Byler, a director of Grant and treasurer of the Foundation. The Foundation owned 9.4% of Grant's outstanding common stock (1,294,325 shares). CBT and Staley were co-trustees of trusts that held 11.9% of the outstanding shares (1,651,940 shares). CBT and Mayer were co-trustees of trusts that in April 1969 held 7.7% of Grant common stock, and by the end of 1969 held 14.8% (2,052,956 shares). CBT and Byler were co-trustees of another several hundred thousand shares. In all CBT was trustee or co-trustee of 28% of Grant's common stock. At the end of 1969, the Foundation was remainderman of 3,402,336 of these shares in trust, and the Foundation's approval was required before the trusts could sell the shares of which it was the remainderman.

## II.

On April 13, 1976, the W. T. Grant Company was adjudged bankrupt, and the plaintiff, Charles G. Rodman, was named Trustee in Bankruptcy. The company's overwhelming financial collapse came in the wake of the business conditions and problems with which Grant was apparently confronted in the changed economic climate following the 1974–75 recession.

The plaintiff filed his New York Supreme Court lawsuit on April 6, 1978, just short of two years after his appointment, and this suit followed on April 12, 1978. Parentheti-

cally, the individual defendants have requested that if any of the claims herein were not to be dismissed, this Court should exercise its discretion to stay them until resolution of the state court claims pending on the same transactions.

## III.

The defendants in this suit are the Foundation, CBT and 17 individuals who were directors of Grant. The complaint is set out in five counts. The first two counts are the only counts on which relief is sought against the Foundation. Count I embraces purchases of Grant common stock in 1969, 1970 and 1972, made by Grant from the Foundation pursuant to a Stock Purchase Agreement executed on February 25, 1969, which was approved by a vote of Grant's stockholders, the Foundation abstaining. Count II concerns a purchase in 1970 of Grant preferred stock by Grant's officers, following which Grant's board of directors voted to retire the shares purchased. The remaining three counts pertain to purchases of Grant common stock made by Grant from CBT as Trustee in 1969 (Count III), from CBT and Mayer as co-trustees in 1969 (Count IV), and from New York University and the Sloan-Kettering Institute made in 1972 (Count V).

## Count I: *Purchases Under the Agreement Between Grant and the Foundation*

In June 1968 the trustees of the Foundation decided to diversify its investments. Later that year Staley told R. M. Lloyd, chairman of the Foundation's board, that Grant wished to purchase some of its own stock for use in its Employee Stock Purchase Plan. Lloyd asked Staley whether Grant was interested in buying some of the Foundation's shares. Staley replied that Grant was interested, and negotiations began.

Grant and the Foundation executed a Stock Purchase Agreement on February 25, 1969. The Agreement provided that the

---

1. The statements in this opinion represent plaintiff's version of facts except where docu- mentary evidence is before the Court or the matters stated are undisputed.

Foundation would sell Grant 250,000 shares of Grant common stock on May 1, 1969, and that Grant would have an option on up to 950,000 more shares, to be purchased in blocks of 200,000 to 300,000 shares on May 1 of each year from 1970 through 1974. Grant had the right to defer purchases from May 1 of each year to May 1 of any of the following years through 1974. The price was to be the average closing market price of the stock during the month preceding the purchase, less 3%. The Agreement was to become effective only if approved by a majority of Grant's shareholders, the Foundation not voting, and if approved could be terminated by either party after purchase of the initial 250,000 shares on May 1, 1969.

On April 1, 1969, Grant sent a proxy statement to its shareholders announcing the Stock Purchase Agreement. They were told that the purpose of the purchases was to meet the requirements of proposed amendments to Grant's 1960 Employee Stock Purchase Plan and for other corporate purposes, including possible acquisitions of other business enterprises.

The statement stated that it was proposed to amend the existing Employee Stock Purchase Plan "to make available additional shares under the Plan in order to permit further offerings to be made to newly appointed executives and managers and to present participants in amounts consistent with their responsibilities." In that connection it was stated that the initial 250,000–share instalment of the purchases would be used for offers to be made under the Plan (as amended) on May 1, 1969, and, to that extent issuance of authorized but unissued shares reserved under the Plan would not be required.

The statement disclosed all of the facts recited in *Part I, supra*, about Staley's, Fogler's and Byler's affiliation with the Foundation and the ownership of Grant stock by the Foundation and the various trusts, except that the statement did not disclose that the trust instruments required the approval of the Foundation before shares of which it was the remainderman could be sold. In addition, the statement disclosed that Sta-

ley and his immediate family owned 53,919 shares, that Byler owned 12,410 shares and had a life interest in another 51,800 shares, that Mayer and his immediate family owned 13,631 shares, and that Fogler owned 54,400 shares. The proxy statement then recited the terms of the purchase agreement and said that in the view of Grant's board the stock purchases would be a desirable way to provide shares for the Employee Stock Purchase Plan and other corporate purposes.

The Stock Purchase Agreement was approved by Grant's shareholders at their Annual Meeting on April 29, 1969. The Foundation did not vote its shares. Under the agreement Grant purchased 250,000 shares at $45.82 per share on May 1, 1969; 300,000 shares at $44.08 per share on May 1, 1970; no shares in 1971; and 250,000 shares at $40.52 per share on May 1, 1972. Grant common stock reached its all-time high of $70⅝ in 1971. On February 15, 1973, the parties terminated the remaining options under the purchase agreement; Grant common was then selling at $37 per share. All told Grant purchased from the Foundation 800,000 shares for $34,810,142.

The Trustee alleges that the purchases of stock made under the stockholders' authorization were unfair and unreasonable to Grant; involved a breach of fiduciary duty by the Foundation and the individual defendants and deception of Grant and its shareholders; and were part of a scheme or artifice by Staley and Mayer, consciously acquiesced in by Grant's other directors, to defraud Grant. The Trustee charges that the "true reason and primary purpose" for the purchases was that Staley and Mayer "wanted to keep said stock out of unfriendly hands in order to perpetuate their own control" and, at the same time, to enable the Foundation and the trusts to receive more for their shares than they would in an arm's length sale. According to the Trustee such a scheme constitutes fraud in violation of section 10(b) of the Securities Exchange Act and Rule 10b–5 thereunder.

The Trustee attacks the proxy statement as false and misleading and in violation of section 14(a) and Rule 14a–9 because it

failed to disclose the alleged "true purpose" of the purchases to the public shareholders and was deficient in the following further respects, namely: that it failed to say that Grant's management had earlier rejected the idea of buying the Foundation's stock for the Employee Stock Purchase Plan; that Grant would have to increase its borrowing to finance the purchases if it was also to maintain its existing expansion and dividend policies; that the proposed purchases would undermine the flow of new capital to Grant; that "it was Staley's and Grant management's opinion that additional equity capital was 'needed,'"; that Grant would have to finance a $20 "loss" on each share purchased; that Grant had eight million authorized but unissued shares that could have been used instead; that the price of the shares was in excess of book value and that Grant's net worth and net worth per share therefore would be decreased by the purchases; that the 3% discount was less than the going rate for block discounts; that the price was more than the Foundation would receive in an arm's length sale; that Grant might have to pay more for the shares than their market price on the day of closing; and that Staley intended to buy 20,000 shares from CBT soon after the Annual Meeting at which the shareholders were to vote on the Stock Purchase Plan.

Finally, the Trustee alleges that the Foundation is liable because Staley, Fogler and Byler acted in concert with and on behalf of the Foundation and for its benefit; because the Foundation was in a position to control or influence the conduct of Staley, Fogler and Byler and failed to do so; because the Foundation permitted the use of its name in false proxy material from which it benefitted; because the Foundation was an aider and abettor; because the Foundation is responsible for the actions of its trustees and officers under the doctrine of respondeat superior; and because the Foundation was unjustly enriched.

Count II: *Purchase of Preferred Stock from the Foundation*

On May 8, 1970, defendant Curtin, then financial vice-president of Grant, wrote to Byler, then treasurer of the Foundation, that Grant was interested in buying the Foundation's 11,929 shares of Grant preferred stock and was willing to pay $51.75 per share, the average price that Grant had paid for its preferred stock during the first four months of 1970. Byler wrote to Lloyd on May 14, 1970, to recommend that the Foundation accept Grant's offer. On May 20, 1970, Curtin wrote to Byler again and confirmed that Grant was willing to buy the preferred shares at $51.75 and to close the sale on July 1, 1970. The trustees of the Foundation accepted those terms at their meeting of June 4, 1970, and the terms were reconfirmed in a letter of June 4, 1970, from Grant's secretary and general counsel to the Foundation.

At the meeting of Grant's board on January 26, 1971, Mr. Curtin reported that Grant had recently purchased 18,500 shares of its preferred stock. The directors then voted to retire those 18,500 shares.

The Trustee alleges that unspecified defendants failed to disclose to Grant's board that the Foundation was the seller of "most" of the shares purchased; that the purchase price was over the market price on the date of sale; and that the closing was delayed to permit the Foundation to receive the second quarterly dividend. Further, the Trustee alleges that the purchases [*sic*] was unfair and unreasonable to Grant; a waste of its assets; a breach of fiduciary duty by the Foundation and certain individual defendants that involved deception of Grant, its directors, and its shareholders; and part of a scheme or artifice of the Foundation and certain individual defendants to defraud Grant. Finally, the Foundation is alleged to be liable for the same additional reasons given in Count I.

Count III: *Purchase of 20,000 Shares from CBT*

On or about June 2, 1969, at Staley's suggestion, Grant purchased 20,000 shares of its common stock from CBT as trustee of a trust established by Mr. Grant. Grant

paid $45.75 per share, 3% less than the average of the high and low market prices on May 29, 1969. Grant's board ratified this purchase after it was consummated.

The Trustee alleges that unspecified defendants did not disclose to Grant's board that the Foundation was the remainderman of the trust that sold the stock or that as trustees or officers of the Foundation, Staley, Fogler and Byler had an interest in the transaction.

Further, the purchase was allegedly part of the scheme or artifice of Staley and Mayer to perpetuate their control of Grant, which was acquiesced in by Grant's other directors and CBT, and which resulted in fraud on Grant.

Finally, CBT is alleged to be liable because its officer acted in concert with Staley and Mayer and was aware that their true purpose was to perpetuate their own control, that it was not in Grant's best interests to buy the shares, and that Grant earlier had rejected the idea of purchasing trust shares for that reason. As a result, CBT is liable as an aider and abettor and for breach of fiduciary duty.

### Count IV: *Purchase Under Agreement between Grant and CBT and Mayer*

On October 28, 1969, Grant agreed with CBT and Mayer, co-trustees of a trust established by Mr. Grant, to purchase 246,664 shares of Grant common stock from the trust. The price was to be the average closing market price during November 1969, less 3%. The approval of the Foundation was required for this sale, and was obtained.

Grant sent a proxy statement to its shareholders on November 7, 1969. The statement recited the terms of Grant's agreement with CBT and Mayer and said that in the view of Grant's board the stock purchase would be a desirable way to provide shares for the Employee Stock Purchase Plan and other corporate purposes. The statement then said that Mayer was both a co-trustee of the trust selling the stock and President of Grant, that Byler, Fogler and Staley were both directors of

Grant and officers or trustees of the Foundation, which was beneficially interested in the stock and had approved its sale. The stockholders of Grant voted their approval of the purchase of the stock, in advance of the closing.

The Trustee alleges that the proxy statement of November 7, 1969, was false and misleading in exactly the same respects as the proxy statement of April 1, 1969, except that, whereas the April 1 statement failed to disclose that Staley intended to make the purchase that is the subject of Count III, the November 7 statement failed to disclose that that purchase had been made. In addition the purchase is alleged to be part of the scheme or artifice described in Count III, and CBT is alleged to be liable for the same reasons that it was alleged to be liable under Count III.

### Count V: *Purchases from New York University and the Sloan-Kettering Institute*

In September 1972 Staley and Mayer caused Grant to purchase 34,140 shares of Grant common stock from New York University and the Sloan-Kettering Institute for $1,333,305.

These purchases are alleged to have been unfair and unreasonable to Grant, a waste of its assets, and a breach of fiduciary duty that involved deception of Grant and its shareholders. In addition, they were allegedly part of a scheme or artifice of Staley and Mayer, acquiesced in by the members of Grant's board who were also officers, to defraud Grant.

### IV.

■ Much of the information that the Trustee alleges was not disclosed either was indeed disclosed or was easily enough available by duly diligent inquiry that it need not have been disclosed. "[T]here is no duty to disclose information to one who reasonably should already be aware of it." *Myzel v. Fields*, 386 F.2d 718, 736 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), cited with

approval in *Seibert v. Sperry-Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978), slip op. at 5053, 5057–58 (Oct. 31, 1978). *See also Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Hafner v. Forest Laboratories, Inc.*, 345 F.2d 167, 168 (2d Cir. 1965); *Jackson v. Oppenheim*, 411 F.Supp. 659, 668–69 (S.D.N.Y.1974), *aff'd*, 533 F.2d 826 (2d Cir. 1976); *Lanza v. Drexel* [1970–71 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,826 at 90,100–01 (S.D.N.Y.1970), *aff'd*, 479 F.2d 1277 (2d Cir. 1973); 3 *A. Bromberg, Securities Law: Fraud*, §§ 8.4 (651)(1), (652) (1977).

■ *Implications of Stock Purchase Agreements for control of Grant.* The Trustee alleges that the two proxy statements failed to disclose that one of Staley's and Mayer's true purposes in the proposed purchases was to maintain their own control of Grant by preventing the Foundation and the trust from selling Grant shares to the public. Even if such a disclosure was required (which, as will be shown below, it was not), the disclosure was made by the transaction itself—by the very enormousness of the volume of stock to be purchased from the Foundation and trust. The proposals to buy 1,200,000 and 246,664 shares of Grant's own common stock (approximately 10.4% of the stock outstanding), combined with the disclosure of the stock holdings of the "control group," were inherently unmistakable announcements that a huge block of stock having implications for control of Grant was involved in the purchase contracts. The very size of this enormous block made it unnecessary and redundant to disclose any characterization of the acquisitions or any motivation for it other than to supply shares for the Employee Stock Purchase Plan. Whether the key to such an enormous block of stock remained with the controlling insiders of the corporation while the stock remained in treasury, or was passed along by them to the employees of Grant under the Stock Purchase Plan, the acquisition by the company would self-evidently keep the stock out of "unfriendly hands" and under "friendly" control. *Cf. Falkenberg v. Baldwin* [1977–78 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 96,086 at 91,911 (S.D.N.Y.1977) (desire to remain in office "may be attributed universally to boards of directors and officers of corporations").

■ *$20 loss on purchases under agreements.* The Trustee alleges that the two proxy statements failed to disclose adequately that the price of the stock to be purchased by Grant was approximately $20 higher than the prices at which Grant already had offered shares to its employees and that Grant therefore would have to "finance" a $20 "loss" on each share it bought under the two agreements, (or, what amounts to the same thing, that the purchases would reduce Grant's capital).

Under Grant's Employee Stock Purchase Plan, shares were offered to certain employees at market value. If the employee accepted Grant's offer, he was required to make a down payment of at least $1 per share and to pay the balance within ten years. Both proxy statements disclosed that Grant employees already had agreed to buy shares from Grant at prices ranging from $24.69 to $41.89 per share. Both disclosed the formula for the price that Grant was to pay for shares under the proposed Agreements with the Foundation and trust. From this information one could compute the difference between the amount that Grant was to pay for its shares under the Agreements and the amount that Grant would receive for its shares from its employees.

■ *Authorized but unissued shares.* The Trustee alleges that the proxy statements failed to disclose that Grant had eight million authorized but unissued shares, which could have been used under the Employee Stock Purchase Plan. The financial statements in the 1968 annual report, which was mailed to shareholders at about the time the first proxy statement was mailed and which was called to their attention in that proxy statement, disclosed that Grant had 22,500,000 authorized and 13,854,220 issued shares. The same financial statements were annexed to the second proxy statement.

■ *Accounting consequences.* The Trustee alleges that the proxy statements failed to disclose that the prices of the shares to be bought under the two Stock Purchase Agreements exceeded book value, and that the purchases would decrease Grant's net worth and would have an adverse effect on its profit and loss statement.

The 1968 financial statements referred to above disclosed the amount of Grant's assets and liabilities, the number of shares issued, and the number of treasury shares. From this a shareholder could compute book value and compare it to the likely price to be paid for the stock under the second Purchase Agreement. The statements also disclosed that treasury stock was carried on Grant's books as an asset valued at cost, so that a shareholder could infer that a purchase of stock at more than book value would leave net worth unchanged and increase book value.

*Consequences of pricing formulae.* The Trustee alleges that the proxy statements failed to disclose that the prices to be paid under the Stock Purchase Agreements might exceed the market price on the date of closing. This risk could be inferred easily from the fact that the price was to be the average of the daily closing market prices during a certain month, less 3%, which both statements disclosed.

*Conflicts of interest in purchase from CBT.* Count III alleges that at the time Grant's board ratified the purchase of 20,-000 Grant shares from CBT, it was not disclosed that the Foundation was the remainderman of the trust that sold the shares or that Staley, Fogler and Byler were affiliated with the Foundation and therefore were interested in the transaction. The directors ratified this purchase on June 24, 1969. On the preceding April 1, they sent to the shareholders a proxy statement that disclosed that Staley, Fogler and Byler were affiliated with the Foundation and that the Foundation was remainderman of trusts that held over 3,000,000 shares of Grant stock and of which CBT was either trustee or co-trustee. This information was certainly available to the directors. The

disclosure that the Foundation was remainderman of the trusts was sufficient to put the directors on notice that the shares purchased were from a trust of which the Foundation was remainderman.

## V.

The Trustee charges that the defendants failed to disclose certain information that they were actually under no legal duty to disclose even if the information was not otherwise available. This information includes the defendants' subjective purposes in the stock purchases, speculation about the financial consequences of the purchases and the price that the sellers could have obtained in other circumstances, as well as other facts that either were not material or whose omission in no way made the proxy statements false or misleading.

*Subjective purpose.* The Trustee alleges that the two proxy statements failed to disclose that Staley's and Mayer's true purposes in the proposed purchases of stock were to prevent the Foundation and trust from selling Grant shares to the public, (which would have diluted Staley's and Mayer's control of Grant) and to enable the Foundation and the trust to receive more for their shares than they would have received in an arm's length sale. The defendants argue that this allegation cannot survive *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

It should be remembered that the proxy statements did disclose the facts from which these alleged conflicts of interest could be inferred—the stock holdings of the individual defendants, the Foundation and the various trusts, and the affiliation of the individual defendants with the Foundation and trusts. The Trustee argues that the statements were misleading only by their failure to disclose the actual, subjective purposes of Staley and Mayer.

The Second Circuit has considered this issue in four cases decided after *Santa Fe, SEC v. Parklane Hosiery Co.,* 558 F.2d 1083 (2d Cir. 1977); *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d

1078 (2d Cir. 1977); *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); and *Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703 (2d Cir.), *cert. denied*, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978).

*Parklane* involved a going-private transaction whose true purpose was to enable the controlling shareholder, Somekh, to use the corporation's assets to pay personal debts. The proxy statement did disclose that the merger would entitle the shareholders of the surviving corporation "to the benefit of all of the assets, earnings, earning capacity and cash flow of the Company," and that Somekh and his family owned 86% of the survivor's stock. 558 F.2d at 1086 n.2. The District Court held, and the Court of Appeals agreed, that failure to disclose Somekh's personal debts was a material omission. But neither Court decided whether disclosure of Somekh's debts, but not of his actual purpose to use the corporation's assets to pay them, would have sufficed.

In *Browning*, the defendant corporation solicited the consent of its debenture holders to sell certain assets. The plaintiffs alleged that the solicitation "failed to reveal the conflict between the directors' interest as stockholders and the interests of the debenture holders in formulating the conversion price." 560 F.2d at 1084. The Court of Appeals held that section 14(a) imposed no duty to reveal conflicts of interest. *Id.*

*Goldberg v. Meridor* concerned a transaction by which a sickly parent looted its healthy subsidiary. As it did so, the parent issued bland press releases, which allegedly failed to disclose either the facts of its frail condition or " 'the conflicts of interest of the principals.' " The Court concluded that the first alleged omission would violate section 10(b) and Rule 10b–5:

> We do not mean to suggest that § 10(b) or Rule 10b–5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives. However, if Maritimecor [the parent] was in the parlous financial condition alleged in the opposing affidavit of plaintiff's

counsel, a disclosure of the acquisition of Maritimecor that omitted these *facts* would be seriously misleading.

*Id.* at 218 n.8. As to the alleged omission to disclose the conflicts of interest, the Court noted that the press releases did disclose the number and percentage of the subsidiary's shares owned by the parent and by the parent of the parent's parent. *Id.* at 212 n.2. It was not clear, however, whether the Court thought that this disclosure was sufficient or that none was required.

Finally, *Joyce Beverages* involved an exchange of stock that brought four operating companies under the umbrella of one holding company. The defendants allegedly failed to disclose that their "real purpose," 571 F.2d at 705, was to facilitate loans from the holding company to their own operating company, the weakest of the four. The District Court dismissed this part of the complaint, 430 F.Supp. 677, and the Second Circuit affirmed that ruling.

■ These cases may not have settled whether one must disclose the facts giving rise to a conflict of interest—here the stock holdings of the defendants and the affiliation of the individual defendants with the Foundation and trusts. But even if such a duty exists, it was satisfied here. The cases do make clear, though, that failure to disclose on top of such facts one's actual subjective purpose does not violate the securities laws.

This conclusion is supported also by decisions of other Courts. In *Golub v. PPD Corp.*, 576 F.2d 759 (8th Cir. 1978), the defendants sold the assets of a corporation that they controlled and allegedly failed to disclose that their true purpose in doing so was to receive in return what the plaintiffs claimed was actually a "control premium." The District Court dismissed the complaint, and the Eighth Circuit affirmed:

> Actually, the plaintiffs are not complaining about any absence of facts in the proxy statement. Their complaint is that those who prepared the statement did not "disclose" what the plaintiffs say was the true motivation of Old PPD's management in selling the assets of the company,

and did not characterize the bonus aspect of the transaction as plaintiffs would have it characterized. Under the Act and regulations plaintiffs were not entitled to have such a "disclosure" or such a characterization.

*Id.* at 765. In *Altman v. Knight,* 431 F.Supp. 307 (S.D.N.Y.1977), the defendant corporation made a defensive acquisition during a tender offer. The individual defendants allegedly stated that the acquisition had a legitimate business purpose when its alleged undisclosed motivation was to defeat the tender offer and thereby preserve their jobs. The Court dismissed the complaint, which charged the undisclosed motivation as a fraud.

In *Tyco Laboratories, Inc. v. Kimball,* 444 F.Supp. 292 (E.D.Pa.1977) certain directors caused the corporation to sell preferred stock to a third party in order to prevent it from falling into the hands of the plaintiffs, who were attempting to take over the corporation. It was charged that the directors feared losing control of the company and that no disclosure of these motives had been made. Relying on *Santa Fe,* the Pennsylvania Court held that the alleged non-disclosure did not violate the federal securities laws and dismissed the complaint.

> In cases where the directors, allegedly in violation of their fiduciary duties, have authorized securities transactions it can always be claimed that the directors did so to maintain their control over the corporation and failed to disclose the same thereby making a material nondisclosure of information. If such allegations stated a securities claim it would permit the federal courts to resolve those fiduciary duty cases which the Supreme Court has instructed should be left to the state courts.

*Id.* at 298. *See,* to the same effect, *Biesenbach v. Guenther,* 446 F.Supp. 98 (E.D.Pa. 1978) (reduction of size of board and issuance of one million additional shares of stock to enable defendants "to gain complete control of the corporation"); *Falkenberg v. Baldwin, supra* (failure to disclose existence of a lawsuit in order to perpetu-

ate control); *Jewelcor, Inc. v. Pearlman,* 397 F.Supp. 221, 248 (S.D.N.Y.1975) ("it was not: 'wrong for a corporation to solicit proxies which tend to maintain in office incumbent directors without saying as much. . . . [T]here appears to be no reason why the stockholders should be advised that the proposed amendment may tend to facilitate management perpetuating itself in control. Certainly it is not false and misleading for the management to fail to do so.' ") (quoting *Elgin National Indus., Inc. v. Chemetron Corp.,* 299 F.Supp. 367, 373 (D.Del.1969)).

In *McPhail v. L. S. Starrett Co.,* 257 F.2d 388, 395–96 (1st Cir. 1958) cited by the plaintiff as contrary authority, the Court nevertheless stated:

> [T]he evidence shows a reason for their action other than . . . a selfish desire to entrench themselves in their managerial positions beyond reach of McPhail. . . .
>
> We feel that it would be to "strain at a gnat, and swallow a camel," 23 Matt. 24, for us to infer some improper, ulterior or selfish purpose . . . in the face of positive evidence of the legitimate, indeed the laudable purpose of frustrating a raid by him on the investment of other stockholders.

The Foundation did not act fraudulently either in respect to the securities sold or the legitimate corporate purposes of the purchases, which were submitted to and approved by the stockholders. There was no fraud for the directors to aid or abet. This case is not like the well-known cases relied on by the plaintiff where there is the fraudulent purpose of acquiring control of a corporation in order to loot it. No charge is made or may reasonably be construed of any misappropriation of anything by anyone either by plan or deed in respect of these transactions.

■ *Speculation on financial consequences and obtainable market price.* The Trustee alleges that the proxy statements failed to disclose that Grant would have to borrow in order to finance the stock purchases if Grant was to continue its then-ex-

isting expansion and dividend policies. As noted above, both proxy statements disclosed how much Grant was to pay for the shares and how much it was to get for them from its employees. The 1968 annual report disclosed the number of Grant's stores, the amounts it paid in dividends and for rent, fixtures, and improvements, and the amount of its yearly and total retained earnings, all for the preceding five years. Whether in these circumstances Grant would have had to borrow to finance the stock purchases depends on a speculative prediction of its future earnings and business policies, which it was not obliged to make. *Seibert v. Sperry Rand Corp., supra*, 586 F.2d at 952, slip op. at 5057; *Goldberger v. Baker*, 442 F.Supp. 659, 665 (S.D.N.Y. 1977).

■ The Trustee alleges further that the proxy statements failed to disclose that the purchase prices fixed in the Stock Purchase Agreements were more than the Foundation and the trust would obtain in an arm's length sale if the market were subjected to sale of the shares owned by the sellers. Such a statement, too, would have amounted to little more than speculation, unnecessary for full disclosure of the terms of the transactions contemplated by the Agreements.

> Plaintiffs do not allege that any terms of the transaction were withheld, only that certain conclusions and derogatory predictions were not made. Defendants cannot be liable for a mere failure to say that their deal was a bad one.

*Id.*

■ *Omissions either not material or not misleading.* The Trustee alleges that the proxy statements failed to disclose that Grant's management previously had rejected the idea of buying outstanding shares for the Employee Stock Purchase Plan. In *Goldberger v. Baker, supra*, 442 F.Supp. at 664–65, the Court concluded that the failure to disclose a previous inconsistent policy was, as a matter of law, not misleading.

In addition, the Trustee alleges that the proxy statements failed to disclose that Staley intended to buy, and later did buy, 20,000 shares of Grant common stock from CBT. This omission was not material to the terms of the Agreements submitted to the shareholders; nor has the Trustee pointed to anything in the proxy statements that was made false or misleading thereby.

## VI.

The Trustee alleges that the stock purchases were breaches of fiduciary duty for various reasons. Recognizing that such allegations are vulnerable after *Santa Fe*, the Trustee argues that *Santa Fe* applies only to cases in which the defendant disclosed all material facts but is nevertheless charged with a breach of fiduciary duty. In this case, by contrast, the complaint alleges that by one course of conduct the defendants both failed to disclose all material facts and breached their fiduciary duties. In such a case, the Trustee presumably would conclude, *Santa Fe* allows a plaintiff to assert breach of fiduciary duty as an independent ground of recovery, above and beyond any recovery founded on lack of disclosure.

■ This argument is inconsistent, however, with the decision of the Second Circuit in *Browning, supra*. There the plaintiffs alleged that the directors of the defendant corporation breached their fiduciary duty to the corporation's debenture holders by failing to disclose that the interests of the directors as stockholders were opposed to the interests of the debenture holders and that a conversion price offered to the debenture holders was unfair. 560 F.2d at 1082. The Court wrote:

> To the extent that appellants seek recovery on the ground that DASA's directors breached an alleged fiduciary duty to deal fairly with its debenture holders . . . it is clear since the Supreme Court's recent decision in *Green v. Santa Fe Industries, Inc.* [*sic*] . . . that no such duties are imposed by federal law upon corporate directors and that violation of any such state-law fiduciary duties, including non-disclosure of conflicts of interest or unfairness of a conversion price, will not support a claim of constructive fraud under § 14(a) . . . .

*Id.* at 1084 (emphasis added). Under this interpretation of *Santa Fe*, independent claims for relief are not stated by the Trustee's allegations that the stock purchases were a breach of fiduciary duty, unfair or unreasonable to Grant, a waste of Grant's assets or made at an excessive price, or not in Grant's best interests, or that the purchases resulted in the unjust enrichment of the sellers.

## VII.

 A further defect in the complaint is that Counts II and III do not allege fraud "in connection with the purchase or sale of any security," as Rule 10b–5 requires. The Second Circuit has interpreted a "purchase" to be completed at the time the parties are "committed" to each other. *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890–91 (2d Cir. 1972). Under this interpretation of Rule 10b–5, neither Count II nor Count III alleges fraud in connection with a "purchase" of a security.

Count II alleges that on or about July 11, 1970, Grant purchased 11,929 shares of its preferred stock from the Foundation; that Grant's board later ratified this purchase; and that at the time of ratification unspecified defendants failed to disclose material facts to Grant's board. The minutes of the board's meeting of January 26, 1971 (which are apparently the Trustee's only evidence of what occurred there) show that the purchases of the preferred stock had been consummated long before the meeting, that the shares had been held in treasury, and that the action taken by the board was to retire the shares, not to ratify their purchase.

Count III alleges that on or about June 2, 1969, Grant purchased 20,000 shares of its common stock from CBT; that Grant's board later ratified this purchase; and that at the time of ratification, unspecified defendants failed to disclose material facts to Grant's board. The minutes of the board's meeting on June 24, 1969 (which the Trustee has submitted in response to the Court's request for documentary evidence of this ratification) show that Grant's board "ratified, confirmed and approved" "all actions taken by the Company's officers in connection with such transaction." Neither these minutes nor the complaint, however, suggests that the consummation of this purchase, or the "commitment" of purchaser and seller to each other, was not complete before the board ratified the purchase.

## VIII.

For these reasons, this suit does not spell out a federal securities law claim, and there is no other basis of jurisdiction on which the Court may proceed.

 The Foundation and CBT are not and under all the circumstances could not be charged with intent to defraud Grant or with intent to aid and abet such an intent on the part of the individual defendants. There was a justifiable corporate purpose ascribed to the purchases from the Foundation and CBT, which were considered and approved by the directors and stockholders of Grant in advance of performance under the Stock Purchase Agreements.

 As to the insider defendants, a purpose to fend off "money raiders" from acquiring large blocks of stock allegedly to serve their own financial interests and in conflict with the interests of Grant and its stockholders is hardly actionable conduct of the corporate managers under the federal securities laws where the stock is being placed at the disposal of employees of the company as incentive to service. At most only possible state-created claims for waste, mismanagement or breach of fiduciary duty are asserted in this suit against those who were Grant fiduciaries.

There is no basis for federal jurisdiction of this suit and as a federal suit it is wanting in merit. The defendants are entitled to and are granted judgment of dismissal.

SO ORDERED.

*N.B.* In view of the conclusion reached here that there was no cognizable material deception, the Court deems it to be unnecessary to deal with the contention that a Trustee in Bankruptcy lacks standing to maintain such a suit under section 14(a) of the Securities Exchange Act in circum-

stances where the stockholders stand to receive nothing from the Estate on any conceivable set of facts, or with the contention that there was no causal connection of any violation with the ultimate worthlessness of the stock many years and economic cycles later. On the latter point *see Rochelle v. Marine Midland Grace Trust Co.*, 535 F.2d 523, 529 (9th Cir. 1976); *Miller v. Schweickart*, 413 F.Supp. 1059 (S.D.N.Y.1976); *McLaughlin v. Campbell*, 410 F.Supp. 1321 (D.Mass.1976).