**FINANCIAL INDUSTRIAL FUND, INC.,**
a Maryland corporation, Plaintiff-
Appellee,

v.

**McDONNELL DOUGLAS CORPORA-
TION,** a Maryland corporation,
Defendant-Appellant.

Nos. 71–1387–71–1389.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 13, 1972.

Decided Feb. 20, 1973.

Rehearing Denied April 5, 1973.

Edwin S. Kahn, Denver, Colo. (James L. White, John Fleming Kelly, and Bruce W. Sattler, Denver, Colo., and Holland & Hart, Denver, Colo., of counsel, with him on the briefs), for defendant-appellant.

Leland E. Modesitt, Denver, Colo. (John J. King, Jr., Ward E. Terry, Jr., and Richard H. Shaw, Denver, Colo., with him on the briefs), for plaintiff-appellee.

Before LEWIS, Chief Judge, and HILL, SETH, HOLLOWAY and BAR-RETT, Circuit Judges, sitting en banc (McWILLIAMS and DOYLE, Circuit Judges, having recused themselves).

PER CURIAM.

The plaintiff, Financial Industrial Fund, Inc., a mutual fund or management investment company, brought this damage action against McDonnell Douglas Corporation, and against the under-writer of Douglas, Merrill Lynch, Pierce, Fenner & Smith, Inc. The action is based on Rule 10b–5 of the Securities and Exchange Commission. Trial was to a jury which rendered verdicts against the defendants in the amount of $712,500.00. An appeal was taken initially by the several defendants, but the appeal as now perfected concerns only the plaintiff and the defendant, McDonnell Douglas Corporation.

The defendants moved for directed verdict at the close of plaintiff's case and at the close of defendants' case. These were denied. The defendants also moved for judgments notwithstanding the verdict and for a new trial. These were also denied.

Certain corporate changes in Douglas took place following the events here involved, but these are not significant for the purposes of this opinion. The defendant-appellant was engaged at the pertinent time in the manufacture of aircraft, and of various vehicles and systems for the space program.

The events which gave rise to the complaint relate to the purchase by Financial Industrial Fund of shares of the common stock of Douglas. A decision by plaintiff to buy 100,000 shares was reached on June 21st, 1966, and the actual purchases in the open market or over the counter began early in the morning of June 22d. That morning by 9:15 a. m., Denver time some 57,000 shares were bought. Plaintiff's officer who was instrumental in reaching the decision to buy was surprised at the large number of shares offered, and he ordered that purchases stop. Nevertheless some 23,000 additional shares were purchased the following morning of June 23d. No purchases were made from Douglas or Merrill Lynch.

On June 24th plaintiff heard of the announcement to the press by Douglas that its earnings for the last six months period were twelve cents per share. The issues in this appeal center around this special earnings statement. This earnings figure for the period was far below estimates made by independent market analysts and brokers prior to such date and known to plaintiff. The plaintiff had not consulted with Douglas or Merrill Lynch before the purchase. The regular quarterly earnings statement for Douglas was not due until its scheduled time in mid-July. This fact was known generally to investors including the plaintiff. The public markets reacted to the special earnings statement of Douglas of June 24th by beginning a substan-

tial decline. Plaintiff then contacted Douglas and engaged a market specialist to analyze the position of Douglas. Plaintiff on June 30th reached a decision to sell the shares of Douglas and the 80,000 shares were sold between July 1st and 8th for a price substantially below the purchase price.

The appeal presents no issues concerned with any direct purchase and sale of stock between Financial Industrial Fund and Douglas, nor any issue of inside dealing or of "tipping" by Douglas. The plaintiff is in the position of any purchaser in the open market, and the information with which the case is concerned was public information. The plaintiff being a mutual fund is in the business of making money by the investment of the money of others, and as such holds itself out as an expert or professional as to investments.

The case was originally heard by a panel of this court, but it was decided to hear the case en banc with the parties to give particular attention to the issues herein treated. It was necessary for two judges to recuse themselves from hearing the case en banc. In view of the fact these two judges cannot participate, and in view of the inability of the panel to agree on the issue as to the proper statute of limitations to apply, that issue is not here decided. It is expected that the issue of which limitations period to apply will again arise in the near future in an interlocutory appeal, and a full court then can act.

The record shows that on May 27, 1966, the president of Douglas was advised that the Aircraft Division of the company was experiencing delays in deliveries by its suppliers of components, and that the work force was not as efficient as had been expected. A group of corporate officials was sent to determine the extent of the problems, and it reported back on May 31st that the delivery of some eighteen airplanes in the process of assembly could not be made until the next fiscal year. On June 1st an announcement of the delay was made to the press. This concluded with a statement that earnings for the fiscal year would be adversely affected.

The company had just completed the call of existing convertible debentures, most of which were converted to common stock as the prevailing market price of the stock made it favorable for the holders to so convert. On June 1st the directors approved the issuance of new debentures with Merrill Lynch as the underwriter. In connection therewith, a preliminary prospectus was soon prepared and issued (June 7th) which showed the first five months earnings (December through April) to be slightly below the same period for the prior fiscal year. The quarterly financial analysis was underway as was an evaluation of the stages of completion of some 381 airplanes in the process of manufacture.

Profit figures from the Aircraft Division were given on June 14th to an officer in the comptroller's office who was assembling the data for regular financial reports. These figures showed a loss for the division of several million dollars for the month of May. This official and the company comptroller went the next day to discuss the matter further at the Aircraft Division and decided to call in the company's outside auditors for consultation as to whether inventory revaluations should be made under the circumstances. On June 17th the president of Douglas sent fifty to seventy engineering, estimating, and accounting officials to the Aircraft Division to investigate the situation. This group reported back on June 20th that the expected six months earnings figure for the entire company would be about fortynine cents. Meetings with the outside auditors to consider the finding were held on the next day and the day following. After the second meeting on June 22d it was decided that a substantial inventory writedown was required in view of the losses, and this would reduce the six months earnings figure from the forty-nine cents previously reported to the president to a figure of twelve cents. The president then on the next day ordered a press release to be pre-

pared relating to the earnings so determined for the past six months. This was done the same day in time to be made public before the opening of the New York Stock Exchange on June 24th. The market price of Douglas stock declined $2.75 per share to $76.00 on the 24th. By the time plaintiff had sold its shares of Douglas in question (July 8th), the stock closed at $64.50 per share.

The record showed that the market price of the common stock of Douglas fluctuated in its fiscal year of 1965 between $71.75 and $24.50 per share, and in the following fiscal year to June it fluctuated between $108.61 and $68.68. Earnings also fluctuated widely over the same period and prior thereto, as did annual gross sales. At the time in issue, Douglas had a backlog of orders for airplanes which was substantial.

Defendant Douglas argues that the elements of an action under Rule 10b–5 were not shown. Specifically, defendant urges that the plaintiff failed to show facts to meet the scienter standards or requirements, which were applicable to a complaint alleging a failure to issue the special earnings statement at an earlier time. Defendant urges that under the evidence the trial court did not apply the correct standard in ruling on its motion for a directed verdict and judgment n. o. v. Defendant also urges here that incorrect instructions were given by the trial court relating to the same matters.

There has been much written on the matter of scienter in actions under Rule 10b–5, and especially in the departure from the initial pure fraud concepts. The movement toward modified scienter requirements and the use of negligence language has been fully described. It would serve no useful purpose to analyze it further here. The change has taken place in many jurisdictions. See the decisions of this court hereinafter considered; also, Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123 (7th Cir.); City National Bank of Fort Smith, Ark. v. Vanderboom, 422 F.2d 221 (8th Cir.); Ellis v. Carter, 291 F.2d 270 (9th Cir.).

We have considered the arguments that to move the standards entirely into the negligence field may likewise move the statutory basis for Rule 10b–5 out from under section 10b, which has no negligence language.

This court in Gilbert v. Nixon, 429 F. 2d 348 (10th Cir.), considered an appeal which raised claims based on Rule 10b–5 and also on section 12(2) [15 U.S.C. § 77l(2)]. The court there referred to the statutory standards in section 12(2) and held a similar test to be applied in the combined claim. In Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir.), a Rule 10b–5 case, we referred to the holding in Gilbert v. Nixon, and there said that the defendant, Texas Gulf Sulphur, did not sustain its burden of proving that it did not know the statement in issue was false, " . . . nor was it demonstrated that with due diligence TGS could not have known of the faultiness of the statement." See also Allen v. H. K. Porter Co., 452 F.2d 675 (10th Cir.). The Mitchell case was decided after the case before us now.

■ In these same decisions, Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir.), and Gilbert v. Nixon, 429 F.2d 348 (10th Cir.), we have expressed the requirement that the plaintiff must also exercise good faith in its purchase, due diligence, and demonstrate reliance on the acts or inaction of the defendant.

■ The case before us does not present any significant new issues except those which arise from the different nature of the event upon which the cause of action is based. Here the plaintiff complains that the special earnings report of defendant should have been issued some days before it was. We are thus concerned only with the issue of the timing of the special statement on earnings. This is silence at the time of the occurrence of the operative events in the corporation's business until the statement was issued, and more particularly the issue becomes whether the silence of defendant at the date or dates of the stock purchases by plaintiff here

give rise to a cause of action under Rule 10b–5. This matter of silence is somewhat different from instances where a financial or other type of statement is released and the issue is whether the statement is correct, because in the latter there is a reasonably direct way to test the statement against the facts as they existed, all of which involve objective matters. However, where the silence is at issue, the proof must be directed to the corporate and individual reactions to the facts showing a change in corporate circumstances, and how the decision was reached to issue a statement at a particular time. In these considerations the evidence, as indicated in this record, is well within the decisional processes of the corporate financial specialists and corporate management. The silence or the timing are matters which require the court or the jury to examine how these decisions were arrived at by using many subjective factors and by excluding hindsight.

Thus was the management correct in here evaluating the significance of the slowdown in the aircraft manufacturing process as to extent and impact on earnings during a particular period so as to require the issuance of a special earnings statement? Secondly, was this process conducted with reasonable dispatch considering the need to ascertain the details as to the particular problems, to relate them to other earnings, and to arrive at a conclusion with confidence that the statement when issued would be correct? These factors take us so much farther within the corporate decisional processes than do misleading statements actually issued.

■ Since the timing decision is one concerned fundamentally and almost exclusively with matters of discretion and the exercise of business judgment, it is appropriate to consider the rationale of the "business judgment" rule. This has long developed in actions brought against corporate officers and directors by stockholders and former stockholders concerning decisions of such officials calling for the exercise of their discre-

tion as to significant corporate matters, made in good faith. Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662; Herald Co. v. Seawell, 472 F.2d 1081 (10th Cir.). See Fletcher, Cyclopedia of Corporations, § 1039. The business judgment rule has been expressed in a variety of ways but it may be stated that the directors and officers of a corporation will not be held liable for errors or mistakes in judgment, pertaining to law or fact, when they have acted on a matter calling for the exercise of their judgment or discretion, when they have used such judgment and have so acted in good faith. The reason for the rule is stated to be that in order to make the corporation function effectively, those having management responsibility must have the freedom to make in good faith the many necessary decisions quickly and finally without the impairment of having to be liable for an honest error in judgment. The rule itself, of course, is not directly applicable, and it is not to be so applied here, but the reasons for it are considered as extended to the corporate entity. The Second Circuit in Securities & Exchange Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir.), said in a footnote that the *timing* of the disclosure of material facts " . . . is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC." The court there held a valid corporate purpose was served by withholding information from the public on the discovery of ore in a test drilling, thus a matter within the "business judgment" of management. Thus considering the factors compelled to be evaluated in this silence case as revealed in the record before us, we must hold that the decision of the officers or directors, and the corporate decision of the defendant to issue an earnings statement on other than the customary date for such statements, and the timing of such statement was a matter of discretion.

On another point, we held in Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir.), that the information about which the issues revolve must be "available and ripe for publication" before there commences a duty to disclose. To be ripe under this requirement, the contents must be verified sufficiently to permit the officers and directors to have full confidence in their accuracy. It also means, as used by the Second Circuit, that there is no valid corporate purpose which dictates the information be not disclosed. As to the verification of the data aspect, the hazards which arise from an erroneous statement are apparent, especially when it has not been carefully prepared and tested. It is equally obvious that an undue delay not in good faith, in revealing facts, can be deceptive, misleading, or a device to defraud under Rule 10b–5.

Some further brief references to the record are necessary to demonstrate the application of law to the facts before us. The executive vice-president of the plaintiff fund testified as to the news report on the purchase by United Airlines of twenty-four Douglas DC-8 jets for two hundred million dollars. He said that his company had been considering the purchase of either Boeing or Douglas stock since the end of 1965, " . . . and this particular release indicating that United had purchased another $220 million of Douglas Aircraft jets triggered me to call a meeting of the investment committee of Financial Programs and suggest to the director of research who had been following this company personally that it now seemed like an appropriate time to purchase the stock." He continued to say that he was of the opinion that Douglas could make more money on this particular airplane than on the newer DC-9. He also testified that the purchase began the next day, and he expected that it would take several weeks to purchase 100,000 shares of Douglas. He testified as to the wide fluctuations in the price of Douglas stock. He said also:

"Prior to June 24 we thought that Douglas Aircraft Company would report a profit for the second fiscal quarter ending May 1966."

and

"The report of June 24th for the six months ending May 31st, when compared with the five months ending April 30th, indicated that there was a very major loss in the month of May of 1966."

This officer of plaintiff also testified that he was aware that Douglas " . . . had some problems as early as April 1966." He described these problems as slow deliveries of engines and landing gear assemblies to Douglas from suppliers which caused delays in production. He was aware and took into account the Douglas report of June 1st of a slowdown in manufacture and delivery of planes with an adverse effect on 1966 earnings. He testified he also was aware in early 1966 of the labor problem Douglas was having, and the effect of the war on delivery of components. As to the earnings figure compiled by plaintiff he said a wide range was necessary because: "The very nature of Douglas business made their earnings volatile." He expected the United order to be reflected in earnings the following year. He said also that the purchase was with the intention of a long-term holding. The record shows that plaintiff employed some ten persons as stock analysts, but no report was received from them as to this purchase.

The officials of Douglas testified that at the annual meeting on April 20, 1966, the stockholders were told that earnings would be better for the coming year (1966) than for the previous year which was $3.15 per share. Then in the latter part of May the president became concerned with the profits in the Aircraft Division, and a financial review was begun. The president organized a group of officials to look into the matter over the Memorial Day weekend and report on May 31st. This was done and the group reported that costs were up and

earnings would drop for the year to about $2.00 per share. The company then on June 1st issued a statement which did not give an estimated dollar figure for earnings as it was a company policy not to do so, but stated that there would be delays in the delivery of DC-8s and DC-9s and this would have an adverse effect on 1966 earnings.

The president of Douglas testified that about June 17th, new estimates of earnings were given him out of a continuing discussion of the matter. A new group was then formed to investigate the aircraft costs and earnings and this group submitted an estimated figure on June 20th of forty-nine cents. He testified that the study and concern continued and on the evening of the 23d of June, the company financial group and the auditors worked on the figures again preparatory to a press release to be made the next day. This last analysis revised the prior figures and arrived at the twelve-cent figure after an inventory write-down. This was included in the press release of June 24th.

The principal Douglas official in the section concerned with financing testified that on June 14th, for the first time the decline in earnings was serious and became apparent to him. He had that day received figures by telephone from the Aircraft Division as part of its periodic report due the day before. This telephone report was a listing of figures and showed a very large loss for the month of May—much more than had been anticipated. This official with the company comptroller visited the Aircraft Division the next day to find out what had happened to the prior cost estimates. The matters were discussed and the outside auditors were called in to advise whether a write-down of the inventory would be required. This was decided to be done, and it further reduced the earnings. Management was advised and steps were taken as above described, culminating with the issuance of the special earnings statement.

The plaintiff put in considerable testimony directed to the five months earning figure (December through April 1966) contained in the preliminary prospectus prepared in anticipation of the issuance of new debentures authorized by the board of Douglas on June 1st. This showed figures from which earnings for that period of eighty-five or eighty-nine cents per share could be derived. The principal accounting officer of Douglas testified that this was a correct figure for the period covered. The serious loss in May plus the large resultant write-down of inventory produced the figure for the six months ending May 30th which was also correct, and thus there was no inconsistency. The May loss plus the write-down had a significant effect on the six-month figure used in the June 24th release. This witness, having been questioned as to the known existence of delays in the delivery to it by suppliers, and of labor problems, said of translating these general conditions into figures:

"A And that is the point of time when you make this estimate. That's what I am trying to get at, that there is no way to reach those things. You know you have a situation, but the only point you can measure it and put numbers and dollars on it is that particular point of time when you have gone through the detail of building up your cost estimates and arrived at your final estimates.

"Q And your point of time, according to your view of it, is at that time, as of May, and no other time?

"A Exactly."

An important factor in the proof was the matter of the call of the old issue of convertible debentures in which both Douglas and Merrill Lynch participated. At the effective date the debentures could be converted to stock on the basis of $77.00 per share of stock to be issued by the company. The market price was above that figure at the time and virtually all debenture holders so converted.

As indicated above the principal executives of Douglas did the preliminary work on a new larger issue of deben-

tures some time in April and secured formal board approval on May 1st. Merrill Lynch was the underwriter for this issue. In this capacity Merrill Lynch participated in the preparation of the necessary preliminary prospectus and the data for the registration. Both worked with the data for these purposes. Merrill Lynch was thus furnished financial information during the pertinent period up to and including the special earnings statement of June 24th. Merrill Lynch had a real interest in the financial condition of Douglas at this period, and apparently had full information. The record shows that Douglas gave Merrill Lynch the opportunity to withdraw, but it did not do so. Merrill Lynch is not a party to this appeal and thus the issues and the record are considered only as to Douglas.

It is apparent that a decline in earnings at the pertinent time would cause problems in connection with both issues of debentures for Douglas and more so for Merrill Lynch. The record shows there existed as to Douglas a strong motive for it to withhold information as to a decline in earnings. This proof is clear in the record and occupies, with the inferences sought to be drawn, a considerable part of the record.

In the setting of this motive the record shows: the known slowdown in the assembly of planes with delays expected in the finished product; the investigation, and the public announcement of May 1st of the slowdown with the warning that it would " . . . have an adverse effect on earnings" for the current period. The problem in May was indicated and management reacted against on the 14th of June when the May figures began to come in, showing a serious financial impact in May. However, there is nothing in the record other than speculation that the extent of the May loss could have been determined and translated into figures at an earlier date to develop a statement ripe for publication. The record thus shows without contradiction as to the defendant Mc-

Donnell Douglas as a matter of law that there was exercised good faith and due diligence in the ascertainment, the verification, and the publication of the serious reversal of earnings in May.

Much of the earnings decline was caused by the large write-down of inventory, and the need for this as a proper accounting measure is not challenged by plaintiff. There were questions by plaintiff as to the timing of the write-down but the decision was not seriously challenged.

Furthermore there was no showing by plaintiff of the reliance required nor facts to meet the standard of due diligence on its part. It is apparent that an earnings statement issued by a corporation at any but the expected time which shows any substantial change is bad news for someone who had been recently in or out of a fluctuating market.

■ To prevail the plaintiff in this silence case had the burden of proof to establish that it exercised due care in making its stock purchase, that the defendant failed to issue the special earnings statement when sufficient information was available for an accurate release (or could have been collected by the exercise of due diligence), and to show there existed a duty owed by the defendant to the plaintiff to so disclose as to do otherwise would be a violation of Rule 10b–5, and upon inaction under such showing plaintiff relied to its detriment. The defendant as a separate defense could show either good faith or the exercise of good business judgment in its acts or inaction. The evaluation of the significance of the change in defendant's earnings as it might affect the corporation, its stockholders, or persons considering the purchase of stock, called for the exercise of discretion, and upon a showing of the exercise of due care in the gathering and consideration of the facts, a presumption arose that the evaluation made was in the exercise of good business judgment although subsequent

events might show the decision to have been in error.

Mention should be made of our decision in Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir.), where there was no direct holding as to the standard of care required of the defendant as to the contents of a statement actually issued because the statement there concerned was obviously and intentionally misleading, as the trial court and this court indicated. So we did not there expressly require that the defendant meet a burden of showing due care although such would have been a defense. The burden of showing lack of due care in such circumstances is part of the plaintiff's case.

Under the standards herein set out, the trial court should have granted the motion of defendant Douglas for judgment notwithstanding the verdict. We have considered the evidence most favorably to the plaintiff, and have given it the benefit of all reasonable inferences which may be drawn from the evidence. Gulf Ins. Co. v. Kolob Corp., 404 F.2d 115 (10th Cir.); Giblin v. Beeler, 396 F.2d 584 (10th Cir.); Jamaica Time Petroleum, Inc. v. Federal Ins. Co., 366 F.2d 156 (10th Cir.); Peter Kiewit Sons Co. v. Clayton, 366 F.2d 551 (10th Cir.). In so doing we have separated the evidence relating to Merrill Lynch from that relating to Douglas. The evidence as to Douglas, as indicated above, shows the presence of a strong motive to delay the publication of figures showing a decline in earnings, but there is no proof that there was such a delay within the legal standards set forth above. There was speculation and innuendo, but no facts. Thus under the standards heretofore set forth by this court and herein described, the trial court should have granted defendant's motion for judgment n.o.v. We point out that our decision in Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir.), was after the trial in this case, also that a full expression of the law applicable to these unusual circumstances has not been heretofore made by this court.

The judgment is reversed and the case remanded with directions to enter judgment for the defendant, McDonnell Douglas Corporation, notwithstanding the verdict.