**Milton FISHER, Plaintiff,**

v.

**The PLESSEY COMPANY LIMITED and Plessey Incorporated, Defendants.**

No. 82 Civ. 1183 (WCC).

United States District Court,
S.D. New York.

March 15, 1983.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff; Robert M. Kornreich, Michael P. Fuchs, New York City, of counsel.

Satterlee & Stephens, New York City, for defendant; James F. Rittinger, Sally P. Falck, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiff Milton Fisher ("Fisher") brought this action against defendants The Plessey Company Limited ("Plessey") and Plessey Incorporated ("Plessey Inc.") alleging various violations of the federal securities laws in connection with a 1980 tender offer by Plessey for Plessey Inc. debentures. The case is now before the Court on a blunderbuss motion by defendants to dismiss the complaint pursuant to Rules 12(b)(6) and 9(b), F.R.Civ.P. or, in the alternative, for summary judgment, Rule 56, F.R.Civ.P. With one exception noted below, these motions are denied.

*The Complaint*

Fisher, an owner of $15,000 (face amount) of Plessey Inc. debentures, claims that Plessey's actions in connection with its tender offer for the Plessey Inc. debentures violated the antifraud provisions contained in Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("the Act"), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and Section 14(e) of the Act, 15 U.S.C. § 78n(e)[1] and that portions of the tender offer materials violated the reporting requirements of Section 13(e) of the Act, 15 U.S.C. § 78m(e). Plaintiff also contends that defendants are also liable for breaches of state law fiduciary duties.

The complaint sets forth the following factual allegations in support of these claims. On March 18, 1980, Plessey, an English public limited company,[2] commenced an "any or all" tender offer for the 4½% convertible subordinated debentures, due June 1, 1993, of Plessey Inc., its wholly-owned United States subsidiary. The debentures were traded on the American Stock Exchange and were convertible at the holder's option into Plessey stock at the rate of 14.3711 American Depository Receipts ("ADR") per each $1,000 face amount debenture. These ADRs, which are publicly traded in the United States on the New York Stock Exchange, each represent ten Plessey dollar ordinary shares, which are in turn convertible into Plessey ordinary shares, traded on the London Stock Ex-

---

1. Although the action is labeled a class action pursuant to Rule 23, F.R.Civ.P., there has been no motion for class certification.

2. Plessey is engaged in the manufacture and sale of telecommunications and electronic systems and has approximately $1.2 billion in assets.

change, on a one-for-one basis. Thus, the price of the debentures is related to the price of Plessey's ordinary shares. Under the terms of the offer, Plessey agreed to pay a net cash price of $585 per $1,000 principal amount debenture.[3] The offer was initially set to expire on April 7, 1980, but was extended prior to that date through April 30, 1980.

Fisher alleges that immediately prior to the tender offer the conversion value of each $1,000 principal amount debenture was $417 based upon a market price of $29 per ADR. He further claims that the offer to purchase, the transaction statement and the issuer offering statement were false and misleading because defendants

(1) failed to furnish any financial statements and/or financial information concerning Plessey or any fair or adequate summary thereof as required by Section 13(e) of the 1934 Act and Rules 13e–3 and 13e–4 promulgated thereunder; [4]

(2) failed to give any information concerning the improvement in Plessey's sales and earnings which defendants knew Plessey would achieve for the fourth quarter of the fiscal year 1979 as well as for the entire fiscal year 1979;

(3) failed to give any information concerning Plessey's improved market position by reason of the sale of two unprofitable subsidiaries and an expected increase in orders;

(4) falsely stated their belief that the offer was fair, without giving an analysis of the transaction's fairness as required by Rule 13e–3, when they actually expected the price of the ADRs and debentures to increase based both upon disclosure of Plessey's fourth quarter earnings for fiscal 1979 and upon Plessey's expected strong performance during the first two quarters of fiscal 1980; and

(5) falsely stated that, aside from the historical price information presented regarding the ADRs, there was no other information material to a decision whether to tender the debentures.

Plaintiff asserts that defendants timed the tender offer to take advantage of the existing low debenture prices immediately before the announcement of Plessey's strong fourth quarter earnings for 1979. Those earnings, which were publicly reported on June 26, 1980, showed an 81% increase over the fourth quarter of the previous fiscal year. When Plessey's strong performance continued in the first two quarters of fiscal 1980, the ADRs reached a high of 62⅝, thus giving the debentures a conversion value of $903. Plaintiff claims that because of his reliance on the allegedly false and misleading tender offer materials, he was fraudulently induced to sell his debentures at the unfairly low tender price.

*Legal Standard*

Summary judgment is appropriate only where the court is satisfied that the moving party has met its burden of establishing that there exists no genuine issue with respect to any material fact and that it is entitled to judgment as a matter of law.[5] Rule 56, F.R.Civ.P., *Friedman v. Meyers,* 482 F.2d 435, 438–39 (2d Cir.1973). In making this determination, the Court cannot try issues of fact but can only determine whether there are issues of fact to be tried. *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). Moreover, any ambiguities are to be resolved in favor of the nonmoving party. *Id.* The Court will consider affidavits, depositions, answers to interrogatories and admissions, but will not give any effect to mere conclusory allegations or denials, or to unsubstantiated asser-

---

**3.** The tender offer price per $1,000 debenture was actually $600, but $15 of that amount represented accrued interest.

**4.** Plaintiff also alleges that the offer to purchase was false and misleading because defendants incorporated by reference into the tender offer materials certain unspecified public reports of Plessey Inc. and Plessey that were filed with the Securities and Exchange Commission.

**5.** Although defendants style their motion as one to dismiss or for summary judgment, it is clear that they rely on matters outside the complaint. Consequently, the motion is properly treated as one for summary judgment. See Rule 12(b).

tions submitted by a party. The goal of this procedure is not to subjugate the rights of the plaintiff by requiring him to submit to trial by affidavit, but rather to weed out and dispose of unsupportable claims prior to trial as a means of protecting the defendant and the Court from unnecessary proceedings. See *Feick v. Fleener,* 653 F.2d 69, 77 (2d Cir.1981).

*Discussion*

### A. *Disclosure by the Press*

Defendants first contend that they were under no obligation to disclose much of the information omitted from the tender offer materials because the information had previously been widely reported by the press. Thus, defendants claim, the omitted information was in the public domain and plaintiff reasonably should have been aware of it. While defendants are correct in their assertion that "there is no duty to disclose information to one who reasonably should be aware of it," see *Myzel v. Fields,* 386 F.2d 718, 736 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968),[6] an examination of the press reports and a review of the relevant case law has convinced the Court that an issue of fact exists in this case as to reasonable availability of that material to plaintiff.

Plessey states that information regarding (1) its prior quarterly and annual information, (2) its sale of the two unprofitable subsidiaries and (3) its increasing list of orders was loudly and publicly proclaimed in the press. In support of this factual assertion, Plessey has submitted the affidavit of Peter Marshall, Deputy Chief Executive of Plessey, ("Marshall") and a bulky sheaf of news clippings detailing the company's various activities. The extent and nature of the publication of each of the three types of allegedly omitted information will be addressed in turn.

On the issue of public awareness of Plessey's quarterly and annual financial infor-

mation, Plessey points to the documents contained in Exhibits A, D, G and H. Exhibit A is a group of approximately 250 news articles which comment in varying detail about Plessey's financial condition from June of 1979 through March of 1980. Of this plethora of journalistic disclosures, however, only four articles appeared in United States publications.[7] Exhibit D is a report of a press conference held by Marshall in London in August of 1979 during which he responded to questions concerning several of the matters at issue in the instant case. Exhibit G is a copy of Plessey's reports and accounts for 1978–1979 and Exhibit H is a copy of Plessey's Form 20–K statement for fiscal 1979 which was filed with the Securities and Exchange Commission ("SEC").

With respect to the sale of its two unprofitable subsidiaries, Plessey points out that Garrard Inc. was sold in November of 1979 and that the sale was hailed as a step toward plugging a drain on Plessey's resources. Exhibit B comprises approximately 150 articles, many of which recount either Garrard's problems, Plessey's efforts to sell the company or the actual sale of the subsidiary to a Brazilian concern. However, like the articles in Exhibit A, these clippings are drawn in the overwhelming majority from British publications. In fact, three of the four United States-published articles in Exhibit B are among those relied on by defendants to demonstrate public awareness of Plessey's prior financial statements.

During the pendency of the tender offer, Plessey also sold a troublesome Portuguese subsidiary. Defendants contend that despite the "rather insignificant" nature of the subsidiary's losses, the sale was reported at the time, as evidenced by Exhibit C. That exhibit consists of 16 news clippings, only one of which is from the United States and which does not even mention the sale.

---

**6.** The Second Circuit cited *Myzel* with approval in *Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir.1978). See *also Rodman v. Grant Foundation,* 460 F.Supp. 1028 (S.D.N.Y.1978).

**7.** These items include a July 2, 1979 article in the Electronic News, a July 9, 1979 article in the same publication, a March 10, 1980 article in Barron's and a short filler item on March 24, 1980 in the *Electronic Buyer's News.*

Plessey also contends that information regarding its increasing influx of orders was a "well-recognized matter[ ] of public knowledge long prior to [the] tender offer for the Plessey Inc. debentures." Brief, p. 12. Defendants again rely on Exhibits A and D, which were discussed above, to support this assertion.[8]

▮ Clearly, the proof set forth by defendants cannot satisfy the Court as a matter of law that the debentureholders of Plessey Inc. reasonably should have been aware of this information. The issue is not, as defendants would have the Court believe, merely whether the information was made public, but whether the Plessey Inc. debentureholders could reasonably have been expected to know this information from sources other than the tender offer materials. Moreover, there may well be instances in which the offeror's duty to disclose information in the offering materials is not relieved by the public availability of the same information. Cf. Spielman v. General Host Corp., 538 F.2d 39, 40–41 (2d Cir.1976) (per curiam) (investors justifiably consider information in prospectus more objective and reliable than other statements). While it appears from defendants' exhibits that much of the disputed information was widely reported in the United Kingdom, at this stage of the proceedings there is a dearth of evidence to convince the Court that no issue of fact exists with respect to plaintiff's reasonable awareness of this information.

▮ Because of the apparent absence of any substantial press coverage in this country of Plessey's activities, defendants' reliance on the "total mix" cases is unavailing. Without question, a defendant may not be held liable for the failure to repeat material information which has been otherwise publicly proclaimed. See Spielman v. General Host Corp., 402 F.Supp. 190, 195 (S.D.N.Y.1975), aff'd per curiam, 538 F.2d 39 (2d Cir.1976). Rather, a party's "reasonable belief that the other party already has access to the facts should excuse him from new disclosures that reasonably appear to

be repetitive." Frigitemp Corp. v. Financial Dynamics Fund, Inc., 524 F.2d 275, 282 (2d Cir.1975). In evaluating the reasonableness of that belief and the adequacy of the disclosure, the Court must consider the "total mix" of all information conveyed or available to the investors. Spielman, supra, 402 F.Supp. at 195. Of paramount importance in these cases, however, is the direct availability to the investors of the information in question. See Bertoglio v. Texas International Co., 488 F.Supp. 630, 643 (D.Del.1978).

For example, in Spielman the plaintiff alleged that the defendant tender offeror had not adequately disclosed the difficulty it would have in securing operating control of the target company given the staggered terms of the target's board of directors and the cumulative voting procedure employed. 402 F.Supp. at 194. Judge Weinfeld concluded that these facts about the target company were well known to the target's shareholders and therefore were in the "total mix of information available to them." Id. at 201. In affirming that decision, the Second Circuit noted the fundamental character of the disclosed information.

> But this, we make clear, is not a case where the "total mix" of communications alone is relied upon to justify a misleading proxy statement. Generally, the "total mix" would be insufficient to compensate for omissions in the prospectus since an investor is all too apt to look upon those communications as self-serving and to consider the prospectus as a more objective, self-contained statement upon which he may justifiably rely to make an informed investment decision. The "mix" in this instance, however, pertains to a subject—the target company's own staggered board and cumulative voting—of which its own stockholders were *presumably aware,* if they were aware of anything.

538 F.2d at 40–41 (emphasis in original).

Similarly, in Rodman v. Grant Foundation, 460 F.Supp. 1028 (S.D.N.Y.1979), upon

---

8. Defendants also rely on these exhibits to demonstrate broad public awareness of Plessey's bid for a Ministry of Defense contract and its System X telephone switching system.

which defendants heavily rely, Judge Pollack of this Court granted summary judgment dismissing certain nondisclosure claims on the ground that the information was so readily obtainable through diligent inquiry that it need not have been disclosed by the defendants. *Id.* at 1035. In *Rodman,* however, Judge Pollack found that the proxy materials contained sufficient facts that the omitted information was either easily calculable or inferable from the disclosed material. See, *e.g., id.* at 1036–37 (proxy statements disclosed employee prices for stock and formula for price that defendant was to pay for shares; difference between those amounts easily calculable by plaintiffs). *Cf. Bertoglio, supra,* 488 F.Supp. at 643–44 (defendant could not rely on disclosure via press release and Form 10–Q where those items not mailed directly to shareholders and facts concerning first quarter results were not type of information of which shareholders were presumably aware).

This is not to say that dissemination of corporate information via the media can never provide a basis for finding that investors should reasonably have been aware of the material. In *Seibert v. Sperry Rand Corp.,* 586 F.2d 949 (2d Cir.1978), the Second Circuit affirmed summary judgment for the defendants where the information omitted from the proxy statement had been otherwise widely disclosed and discussed. The evidence of public disclosure in *Seibert,* however, greatly exceeded the showing made by defendants here. The Second Circuit summarized the proof in *Seibert* as follows:

> Sperry's lack of discussion must be viewed in the light of the fact that Stevens' labor difficulties were matters of general public knowledge. Affidavits submitted by both parties show that these difficulties were reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions; that a nationwide consumer boycott was being conducted against Stevens, accompanied by massive media advertising. Clearly, all this was information already in the public domain.

*Id.* at 952, (footnote omitted).

Clearly, the matters at issue in *Seibert* were well within the public's purview. Unlike *Seibert,* defendants in the present case have not demonstrated that the American debentureholders had direct access to the information through press reports. Rather, defendants have only demonstrated that these matters were vigorously followed by the British press, a fact that leaves the Court with considerable doubt that the information was easily available here.[9] While, at this juncture, it appears doubtful that defendants intentionally withheld this information, the Court cannot rule as a matter of law that the Plessey Inc. debentureholders reasonably should have been aware of these developments from reports in the British press.[10] Accordingly, defend-

---

9. See *Valente v. Pepsico, Inc.,* 454 F.Supp. 1228, 1242 (D.Del.1978) (issue whether prior disclosure effectively informed shareholders about control left for trier of fact where many details of control were not contained in earlier-disseminated annual report and because details that were disclosed were not prominently displayed).

10. Nor is there any evidence that any of the information regarding Plessey on file with the SEC was ever mailed to Plessey Inc. debentureholders. *Cf. Klamberg v. Roth,* 473 F.Supp. 544, 552–53 (S.D.N.Y.1979). Accordingly, while "corporations are not required to address their stockholders as if they were children in kindergarten," *Richland v. Crandall,* 262 F.Supp. 538, 554 (S.D.N.Y.1967), defendants

must make a showing greater than that demonstrated thus far in order to prove that plaintiff reasonably should have been aware of these facts. For this reason, defendants' argument that plaintiff also should have been aware of the System X telephone system developments and the possibility of certain new contracts also present issues of fact for the jury, both with respect to their materiality and to their prior disclosure in the financial press. See *Securities and Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968) (whether certain information regarding future events is material at a given time depends on a balancing of both probability that the event will occur and the anticipated magnitude of the event in light of total company activity).

ants' argument that they were under no duty to disclose the information because it was already in the public domain and thus was readily available to plaintiff is rejected.

### B. Price considerations in the Plessey Tender Offer

■ Defendants alternatively contend that plaintiff has no claim with respect to the omitted information based on the "efficient market theory." According to defendants, the market is presumed to have taken all of the press reports about Plessey into account when pricing the Plessey securities. Thus, defendants argue, because the market had this information, plaintiff cannot complain that the market price for Plessey Inc. debentures at the time of Plessey's tender offer was understated because of the nondisclosures in the tender offer materials. Defendants further argue, in an obvious bootstrapping of arguments, that there can be no issue of fairness concerning the premium offered for the debentures since it was substantially above the "informed" market price.

This argument is without merit. It would turn the securities law upside down to hold that individual investors are not entitled to disclosure of material information on the assumption that the market has set a "fair" price for the securities at issue. Regardless of what the market wisdom may be, investors are entitled to a disclosure sufficient to enable them to make their own informed choices. Thus, defendants' reliance on the "efficient market theory" as a means to escape disclosure requirements in the context of a tender offer is misplaced. While defendants may ultimately be able to prove that plaintiff reasonably should have been aware of some or all of this information, the need for disclosure itself cannot be obviated on the ground that the market has set a "fair" price.

### C. Materiality

Defendants' next attack on the complaint focuses on whether information that was clearly not disclosed either in the press or in the tender offer documents was "material," thus giving rise to a duty of disclosure.[11] This information includes information relating to Plessey's fourth quarter and year-end 1979–1980 results, Plessey's predictions for those periods and its forecasts for the first two quarters of fiscal 1980. These items will be addressed in turn.

■ When considering the materiality of information under the securities laws, the starting point for the Court's analysis is *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), in which the Supreme Court defined materiality under § 14(a) of the 1934 Act.

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote .... What the standard ... contemplate[s] is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132 (footnote omitted). In reviewing the facts at issue here, however, the Court is equally mindful of the Supreme Court's simultaneous instruction that the issue of materiality involves assessments of reasonableness that are most often suited only for the trier of fact. *Id.* at 450, 96 S.Ct. at 2132. Thus, the Court may grant summary judgment only where reasonable minds could not differ as to the significance of the information to an investor. See *id.*

11. With respect to information previously reported by the British press, defendants basically argue that they had no duty to repeat the information in the tender offer materials. See Defendants' Brief, pp. 9–17. While defendants state in their Reply Brief that the information would not be material or relevant, see Reply Brief, p. 5, it appears that defendants make this argument only in light of the previously-rejected "efficient market theory."

(a) *Preliminary Earnings Reports and Forecasts*

(i) Fourth quarter and fiscal 1979 year-end financials

As stated in the factual summary, Plessey experienced a strong fourth quarter for fiscal 1979, which ended on March 29, 1980 during the pendency of the tender offer. Although the March and quarter results were received from Plessey's subsidiaries on April 8 or 9, shortly after the tender offer was extended to the end of April, the results were not made public until after Plessey's board of directors meeting on June 26, 1980. Plessey contends that this information could not have been disclosed during the pendency of the tender offer because it was not sufficiently verified until after the June board meeting. Defendants characterize the information prior to that time as "raw, uncompiled and unaudited," and suggest that the provisional results were unreliable and thus nonmaterial to the debentureholders' decision.

In support of this argument, Plessey relies on Marshall's affidavit, in which he explains that it is the company's policy not to release any financial figures until after they have been compiled by company accountants, reviewed both by the corporation's outside public auditors and by Marshall, and approved by Plessey's board. In the present case, Plessey received the data from its subsidiaries by April 8 or 9 and consolidated those figures in a "confidential most secret" report dated April 24, 1980, which was distributed to members of the board. Although the board did not meet in April, the figures were considered by senior members of Plessey's management on April 30 and May 1. Marshall states that he and the independent auditors did not approve

the figures until June 20 and that the figures were published immediately after the board's approval on June 26.

Based on this background, Plessey asserts that it cannot be held liable for failing to disclose the information during the pendency of the tender offer because timing of disclosures is left to the business judgment of the corporate officers, and the facts as presented do not suggest any bad faith delay in releasing the figures.[12] This argument, however, ignores the fact that Plessey became aware of these favorable reports at a time that it was making a tender for the securities of its wholly-owned subsidiary. While the business judgment rule may well apply to the typical decision concerning disclosure of corporate earnings information, see *Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514, 518 (10th Cir.) (*en banc*), *cert. denied,* 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973),[13] clearly the corporation's discretion is more limited in a situation where it is buying back its own debentures. In fact, it can hardly be disputed that a corporation has a greater obligation to make known material inside information during the pendency of a tender offer for its own securities than it does in the routine operation of the business. *Cf. id.* at 516 (noting that defendant had not purchased or sold any of the securities at issue).

Thus, while Plessey attempts to demonstrate that there was no undue delay in publishing the figures pursuant to its normal reporting procedures, the real issue is whether the figures were calculable with substantial certainty before that point and

---

12. While Plessey suggests that the information as to the concededly strong fourth quarter earnings would not be relevant to an investor's decision, see Defendants' Brief, p. 23, the materiality of that information clearly raises a question of fact for the jury. That Plessey's corporate officers may not have viewed the information as significantly affecting the profit budget for the year may be relevant to that issue, or to the issue of scienter, but it cannot be viewed as determinative of the materiality question itself.

13. In *Financial Industrial Fund,* the plaintiff alleged that the defendant corporation, in which the plaintiff had purchased stock, should have made earlier disclosure of a special earnings report. 474 F.2d at 517. The court applied the business judgment rule in concluding that the defendant had not unduly delayed disclosing the information but specifically noted that the case did not involve any direct purchase or sale between the parties. *Id.* at 516.

whether they were material and thus should have been disclosed. See *James v. Gerber Products Co.,* 587 F.2d 324, 327 (6th Cir.1978). Although Plessey cannot be expected to publish raw, unverified data, neither can it, under the circumstances of this case, take refuge behind the business judgment rule if preliminary earnings reports were available and substantially verified.[14] As to this question, there clearly exist material issues of fact. Aside from Plessey's potentially self-serving assertion that the information was not suitable for publication until after June 26, 1980, there is only sketchy information provided about the development of the final earnings information.[15] For example, it is not clear whether a preliminary report could have been published based on the figures in the April 24 report to the board of directors or what the status of the information was before the management review of the figures at the end of the month. Accordingly, defendant's motion for summary judgment on this ground is denied.

#### (ii) *Predictions and forecasts*

■ Plaintiff alleges that Plessey should have included in the tender offer documents predictions of the fourth quarter and year-end figures in addition to financial projections for the following two quarters. While acknowledging that defendants are neither required nor permitted to disclose speculative estimates as to future earnings, plaintiff attempts to distinguish between speculative forecasts and "more certain predictions."

That is a distinction without a difference. The cases relied on by plaintiff for support of its position deal with disclosure of *events* that were likely to occur in the future. See, *e.g., SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968). Those cases, unlike plaintiff's instant allegation, concerned the disclosure of relevant facts which would permit the investor to make his own financial projections and estimates. See *id.* at 849. Although defendants must disclose material facts on which projections can be made, see *Straus v. Holiday Inns, Inc.,* 460 F.Supp. 729, 734 (S.D.N.Y.1978), they are not charged with the responsibility of offering their interpretation of those facts or their analysis of the possible effects on the company's future operations.[16] See

---

**14.** Plessey claims that if it had disclosed preliminary results, plaintiff would likely be suing it for misrepresentations and omissions in that document. However, defendants could easily present the preliminary reports as just that and nothing more.

A reasonable shareholder once informed of the contingency, can then determine whether to assume the risk of its occurrence or non-occurrence in accepting or rejecting the tender offer. Where the event, if it should occur, could influence the stockholder's decision to tender, the chance that it might well occur is a factor that should be disclosed to the investor for consideration in making his or her decision.

*Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 251 (2d Cir.1973).

**15.** Plaintiff further asserts that Plessey should have disclosed its earning reports for January and February of 1980. A similar factual issue exists as to the reliability of these figures in addition to the issue of their materiality.

**16.** As indicated in note 14, *supra,* material "facts" can also include events that are only likely, as opposed to certain, to occur. See *Sonesta Int'l Hotels Corp., supra,* 483 F.2d at 251. Plaintiff's argument, however, that a question of fact exists as to whether the March projection was based on sufficient facts to require its disclosure is circular. As stated above, defendants must disclose material facts on which reasonable investors would rely in making their own projections. These "facts" may include contingencies, as for example product development, but do not include projections based on the facts themselves.

Defendants also contend that they were under no obligation to disclose information regarding certain new contracts and its System X telephone equipment. Insofar as defendants claim that plaintiff should have been aware of these facts through media reports, summary judgment is denied for the reasons stated in Section A of this Opinion. See also note 10, *supra.* Furthermore, to the extent that defendants claim that this information dealt with future events too speculative to be material, summary judgment is denied because there is insufficient proof for this Court to decide as a matter of law that the information is non-material. This determination requires a balancing of both the probability that the event will occur and the anticipated significance of the event in relation to the total company activity, see *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 849, a task that is rarely appropriate for summary determi-

*Rodman v. Grant, supra,* 608 F.2d at 72. As opposed to the preliminary earnings reports discussed *infra,* here plaintiff seeks disclosure not of fact but of conjecture, albeit highly competent conjecture. While a company may give such a projection, so long as it sets forth its basis, see *Straus, supra,* 460 F.Supp. at 734, it is not required to do so. *Id.* Accordingly, as to these claims defendants' motion for summary judgment is granted.

### C. *Reliance and Injury*

■ Defendants further contend that plaintiff did not rely on nor was he injured by the allegedly false and misleading tender offer documents. According to defendants, even if plaintiff had been aware of all the material facts, he still would have tendered his debentures pursuant to the offer. The scenario, as defendants script it, is as follows: In the spring of 1980, plaintiff could have purchased approximately 20 Plessey ADRs with the cash received for each tendered debenture. Since the conversion factor for each debenture was only 14.3711 ADRs, defendants assert that plaintiff, if he wished to stay with Plessey, would have tendered his 15 debentures and purchased 300 Plessey ADRs rather than holding on to his debentures because of the low conversion rate. The reliance element is missing, defendants thus contend, because under any circumstances plaintiff would have tendered his shares. Defendants further claim that plaintiff cannot complain of injury arising from his failure to enter into the second transaction—the purchase of Plessey ADRs—because plaintiff was neither a purchaser nor a seller in that foregone opportunity.

Defendants' effort to characterize what plaintiff should have done is unavailing.

The reliance standard tests whether the misrepresentation or omission is a substantial factor in determining the course of conduct that results in the plaintiff's loss. See *List v. Fashion Park, Inc.,* 340 F.2d 457, 463 (2d Cir.1965). In the present case, plaintiff alleges that he relied on the tender document in selling the debentures at an undervalued price. According to plaintiff, had all the omitted information been disclosed, the debentures would have had a higher market value and the tender offer would not have been attractive. Defendants' contention that plaintiff should instead have tendered his debentures and then purchased ADRs to maximize the value of his investment does not disturb plaintiff's essential allegation. While defendants' theory may ultimately persuade a jury, it cannot eradicate a genuine issue of fact. Accordingly, defendants' motion for summary judgment on this ground is also denied.[17]

### D. *Section 13(e).*

Finally, defendants argue that plaintiff cannot recover damages under Section 13(e) of the Williams Act, 15 U.S.C. § 78m(e). Plaintiff claims that defendants have violated Section 13(e) and Rules 13e–3 and 13e–4 promulgated thereunder, 17 C.F.R. §§ 240.13e–3, 240.13e–4, which require that an issuer-tender offeror provide the securityholders with certain information. Specifically, plaintiff claims that Plessey's incorporation by reference in the tender offer materials of several documents filed with the SEC failed adequately to disclose that material to the debentureholders. See Complaint ¶ 17.

Defendants contend that there is no private right of action for damages under Section 13(e). Because this question is appar-

nation and which is clearly inappropriate given the sparse record here.

17. In light of the Court's rejection of the "efficient market theory" as it relates to defendants' obligations of disclosure, the motion for summary judgment with respect to the allegedly misleading statements is denied. The Court agrees with defendants, however, that Plessey was required to state that the debentures might be delisted as a result of the tender offer and that the statement cannot be deemed "coercive."

The Court also denies defendants' motion to dismiss the complaint under Rule 9(b), F.R. Civ.P. Plaintiff clearly alleges with particularity those matters claimed to be fraudulently misleading or omitted.

ently one of first impression in this Circuit, the Court wishes to give this issue further consideration. Although the parties have given some attention to the overall issue, they have not explored the intricacies of the question nor have they analyzed the issue in light of the factors set forth by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The parties are directed, therefore, to file additional briefs on this issue with the Court within three weeks of this Opinion and Order. Accordingly, decision on defendants' motion to dismiss the Section 13(e) claim is reserved.

*Summary*

Defendants' motion for summary judgment is denied with the exception of plaintiff's claims for nondisclosure of financial projections and forecasts. Summary judgment dismissing those claims is granted. Decision is reserved on defendants' motion to dismiss the Section 13(e) claim pending further briefing by the parties.

SO ORDERED.